## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* CHERYL TAYLOR, | § § § | CAUSE NO _____ |
| Plaintiff, | § § | |
| v. | § § | |
| HEALTHCARE ASSOCIATES OF TEXAS, LLC; DAVID HARBOUR; JEFF VINES; and KRISTIAN DANIELS, | § § § § § | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| Defendants. | § § | |

### COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

Qui Tam Relator Cheryl Taylor, on her own behalf and on behalf of the United States of America ("Government"), brings this action to recover civil damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), against Defendant Healthcare Associates of Texas, LLC ("HCAT"), David Harbour, Jeff Vines, and Kristian Daniels, (collectively, "Defendants") as follows:

### I.
### INTRODUCTION

1.      HCAT offers non-hospital physician services to patients, many of whom are eligible for cost reimbursement under Medicare Part B.  HCAT annually submits about $18 million to $20 million in Medicare claims.  Like many health care providers, HCAT submits Part B claims for reimbursement directly to the Government.  Unlike most other health care providers, HCAT and its individual physicians and other employees engaged in a widespread dishonest scheme to defraud the Government by submitting many millions of dollars of false and inflated claims.

2.      HCAT defrauded the Government in at least four main modes.

3.      *First,* HCAT permitted and encouraged its medical service providers to sign and submit to the Government billing records that reflected medical services performed by non-credentialed or under-credentialed providers.  HCAT knew Medicare would not pay for medical

services performed by improperly-credentialed providers, so it intentionally misrepresented who provided the services in order to illegally obtain reimbursement. Had Medicare known the truth, it would not have paid HCAT millions of dollars in reimbursements from taxpayer money.

4.     *Second*, HCAT trained billing staff to change accurate billing codes for certain services for which Medicare did not offer reimbursement (or only partial reimbursement) to fraudulent codes associated with services for which Medicare did offer reimbursement. Sometimes, HCAT staff tampered with the codes before submission to Medicare; but HCAT staff often changed the accurate billing codes to fraudulent ones only after Medicare declined to reimburse the service as originally and truthfully coded. Had Medicare known the truth, it would not have paid HCAT even more millions of dollars.

5.     *Third*, HCAT created a special department called the "PEP" or "Physical Exam Preparation" department to perform lab tests for which Medicare did not offer reimbursement and create sham billing records that misrepresented the actual nature and basis for the services performed. A common example was that the PEP department routinely ordered extensive "screening" lab testing in connection with patients' regular annual wellness checkups (for which Medicare does not authorize payment) but then submit billing records that falsely claimed the tests were ordered during a patient-initiated visit (for which Medicare authorizes payment). The PEP Department scheme cost Medicare millions of dollars that it would not otherwise have paid to HCAT.

6.     *Fourth*, HCAT defrauded the Government by knowingly and intentionally misrepresenting the nature of the care provided in certain circumstances in order to induce Medicare to reimburse HCAT for patient visits, tests, lab work, and other services that were otherwise not eligible for Medicare reimbursement.

7.     Relator is the former HCAT senior manager in charge of "revenue cycle", i.e. HCAT's billing practices with Medicare and other government and private payors. Relator informed HCAT

executives about the fraudulent and improper practices described in this complaint. Not only did HCAT's leadership ignore Relator's concerns, they fired her for objecting to their fraud.

## II.
### PARTIES

8.      Relator is a natural person residing in the State of Texas and is known to the Government.

9.      Defendant HCAT is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Irving, Texas. HCAT may be served with process by serving its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

10.     David Harbour is a natural person who resides in Collin County, Texas, and may be served with process at 1911 San Jacinto Drive, Allen, Texas 75013. Harbour is the Chief Executive Officer of HCAT.

11.     Jeff Vines is a natural person who resides in Denton County, Texas and may be served with process at 2603 King Arthur Boulevard, Lewisville, Texas 75056. Vines is a former Chief Financial Officer of HCAT.

12.     Kristian Daniels is a natural person who resides in Tarrant County, Texas and may be served with process at 2056 Stonecourt Drive, Bedford, Texas 76021. Daniels is HCAT's current regulatory compliance officer.

## III.
### JURISDICTION AND VENUE

13.     This action arises under the laws of the United States to redress violations of the FCA, 31 U.S.C. § 3729, *et seq.* This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732, which provides that any FCA action may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which

any act proscribed by section 3729 occurred, and pursuant to 28 U.S.C. § 1331, which confers jurisdiction to district courts over questions of federal law.

14.    The Court has personal jurisdiction over Defendant HCAT because HCAT maintains its principal place of business within this District and provides health care services and products to federal Medicare beneficiaries within this District.

15.    The Court has personal jurisdiction over Defendants Harbour, Vines, and Daniels, because each of them is a natural person residing in the State of Texas and working and transacting business within this District.

16.    Venue is proper in this District pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391, because Defendant HCAT resides in, transacts and, during all times relevant to this Complaint, transacted business in this District. Additionally, Defendants Harbour, Vines, and Daniels are natural persons working and transacting business in this District, and all are residents of Texas. Additionally, all or substantially all of the events and omissions giving rise to the claims asserted herein occurred in this District.

## IV.
## CONDITIONS PRECEDENT

17.    Pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4(d)(4), Relator will serve a copy of this Complaint on the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information she possesses. Relator will make this disclosure by providing a copy of this Original Complaint and the disclosure materials to the Attorney General of the United States and the U.S. Attorney for the Northern District of Texas.

18.    Relator's disclosures include her signed affidavit and exhibits, plus other evidence submitted to the Government. The disclosures and this Original Complaint together establish the existence of Defendants' False Claims Act violations.

19.     To Relator's knowledge, none of the material information contained in her disclosures and this Original Complaint have previously been publicly disclosed.  As discussed below, Relator is HCAT's former senior manager in charge of Medicare reimbursement claims and has significant, extensive personal knowledge about the wrongful conduct alleged herein.

## V.
### FACTUAL BACKGROUND

**A.     THE GOVERNING MEDICARE RULES**

**i.     Medicare Part B Allows Health Care Providers to Obtain Reimbursement for Covered Services.**

20.     Medicare is a federal health insurance program that covers nearly 60 million Americans who are age 65 or older, disabled, or suffering from certain debilitating diseases.[1]

21.     "Part B" of Medicare addresses coverage for an array of health care services provided outside the hospital context.  Medicare Part B covers doctor's office and outpatient services.  Those are the services HCAT offers to its patients.

22.     The United States Department of Health and Human Services ("HHS") administers the Medicare program pursuant to 42 U.S.C. § 1302(a), and "prescribe[s] such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter."  *See* 42 U.S.C. § 1395hh(a)(1).

23.     Within HHS, the Centers for Medicare and Medicaid Services ("CMS") has direct responsibility for the program and promulgates the forms and rules for submitting reimbursement

---

[1] On December 14, 2018, the United States District Court for the Norther District of Texas concluded in *Texas v. United States*, 340 F.Supp.3d 579 (N.D. Tex. 2018) that certain amendments to the existing Medicare regime passed in 2010 commonly known as the Patient Protection and Affordable Care Act ("ACA") are not constitutional and not severable from the rest of the ACA. The Court enjoined enforcement of the ACA as a whole, leaving in place the pre-2010 Medicare regime. However, on December 30, 2018, the same Court stayed its injunctive order pending appeal, thereby leaving the ACA in place. Relator cites the ACA-amended version of Medicare in this Original Complaint but submits that substantially the same offenses and claims arise under the pre-2010 statutory language and regulations. If future judicial action enjoins or strikes down the ACA, Relator asks permission to re-plead the claims herein under the applicable rules and laws.

claims to the Government. CMS supervises enrolling and credentialing healthcare providers in the Medicare program, reimbursing enrolled providers for Medicare services, and detecting and combating fraud, waste, and abuse of the Medicare program.

24.     On a state-by-state basis, CMS designates other organizations called Medicare Administrative Contractors ("MAC") to act as CMS's proxy. The MACs manage each state's providers' and health care professionals' paperwork. The MACs also help CMS disseminate changes in procedures and rule interpretations. In Texas, the MAC is Novitas Solutions.

25.     As discussed below, HHS regulations give CMS forms and procedures the force of law. The regulations also make it impermissible for providers or other persons seeking reimbursement to make misrepresentations in the course of seeking that reimbursement.

ii.     **Enrollment, Credentialing, and Reimbursement Assignments—Medicare's First Line of Defense Against Abuses.**

26.     CMS requires providers (clinics, practices, etc.) to enroll in the Medicare program as a prerequisite to seeking reimbursement for providing services to Medicare-eligible beneficiaries.

27.     HCAT properly enrolled in Medicare as a provider. Because HCAT submits Medicare reimbursement requests on behalf of individual physicians or other professionals, CMS terms HCAT an "organizational provider." The individual physicians and professionals who provide the services are "individual providers" or "suppliers" in CMS's parlance.

28.     In order to be eligible to submit reimbursement claims to Medicare, each supplier must obtain a unique identification number called a "National Provider Identifier" or "NPI." Organizational providers like HCAT also must obtain an NPI.

29.     In addition to receiving an NPI, each provider or supplier that intends to submit claims for Medicare reimbursement must also complete the Medicare enrollment process. To become credentialed, suppliers must prove they are properly licensed and submit to a background check, among other requirements.

30.     Medicare enrollment is an integral part of the Government's effort to combat Medicare fraud and waste while ensuring that taxpayers subsidize only health care services rendered by properly-qualified persons.

31.     Further, suppliers who choose to practice as part of an organizational provider like HCAT may also assign to that provider his or her right to receive Medicare payments. Title 18 of the Social Security act prohibits Medicare payments for services provider by a supplier (i.e. physician) to be paid to another individual or organization unless the supplier specifically authorizes another individual or organization to receive those payments in accordance with 42 CFR § 424.73 and 42 CFR § 424.80.

32.     Each time an individual supplier moves to another organizational provider that will be making Medicare claims on his or her behalf, he or she must reassign the right to receive reimbursement to the new organizational provider.

33.     Like the enrollment process, the assignment and reassignment procedures are intended to combat claim abuses and fraud.  Chapter 1, Section 30.2.2 of the Medicare Claims Processing Manual promulgated by CMS recites the history of reimbursement assignment abuses and the rules implemented to stem those abuses.

34.     Organizational providers (like HCAT) that employ suppliers can establish that they qualify to receive payment for the services those employees provide by submitting form CMS-855R. Similarly, suppliers assign (or reassign) to organizational providers their own rights to receive Medicare Part B reimbursements using form CMS-855R and CMS-855I.

35.     Once completed, the Government begins making payment for the suppliers' services to the organizational provider. It takes up to 90 days for CMS or the designated MAC to complete the assignment or reassignment process.[2]

---

[2] *See* https://www.novitas-solutions.com/webcenter/portal/MedicareJH/pagebyid?contentId=00004859

36.     While the assignment is being processed, the Government continues to pay directly any Medicare-credentialed suppliers for whom an organizational provider submits claims.

37.     Suppliers who join an organizational provider but who are not yet credentialed may seek retroactive reimbursement for services provided to Medicare patients in the 30 days leading up to the completion of their credentialing.   Similarly, an organizational provider may seek 30-day retroactive reimbursement for newly credentialed employees.

### iii.     Suppliers and Providers Must Be Truthful When Seeking Reimbursement.

38.     Pursuant to 42 U.S.C. § 1395n(a)(1), Medicare pays eligible providers for health care services for Medicare patients "only if . . . written request . . . is filed for such payment in such form, in such manner and by such person or persons as the Secretary may by regulation prescribe . . ."

39.     HHS regulations provide the basic requirements for all claims. Among those requirements, "[a] claim must be filed . . . on a form prescribed by CMS in accordance with CMS instructions." 42 CFR § 424.32(a)(1).

40.     CMS-1500 is the prescribed CMS claim form applicable to HCAT's overpayments. CMS designed it "[f]or use by physicians and other suppliers to request payment for medical services." 42 CFR § 424.32(b).   Providers often submit the CMS-1500 electronically.

41.     CMS-1500 includes fields for the provider to identify the supplier, the organizational provider, the beneficiary, the appropriate procedural and diagnostic codes for the services provided, the dates of service, the amounts charged, and other information.   A copy of a blank CMS-1500 is attached as **Exhibit A** hereto.

42.     Federal law prohibits physicians and Medicare Providers from making "any false statement or representation of a material fact in any application for any . . . payment under a Federal health care program." 42 U.S.C. § 1320-a-7b(a)(1).

43.     Similarly, federal law requires physicians and Medicare Providers who discover material omissions or errors in claims submitted to Medicare to disclose those omissions or errors to the Government.  42 U.S.C. § 1320-a-7b(a)(3).

44.     The requirement that providers be truthful in submitting claims for reimbursement is a general precondition for participation in the Medicare program.  42 CFR §§ 1003.105, 1003.102.

45.     Specifically, CMS requires suppliers (i.e. the treating physicians or other medical professionals) to sign each CMS-1500 and, in doing so, certify the information provided is truthful and the services billed on the form were medically indicated and necessary.  The supplier certifies that:

> In submitting this claim for payment from federal funds, I certify that:
>
> 1) the *information on this form is true*, accurate and complete; . . .
>
> 3) I have provided or will provide *sufficient information* required to allow the government to make an informed eligibility and payment decision; . . .
>
> 5) the services on this form were medically necessary and *personally furnished by me* or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare . . .
>
> 6) for each service rendered incident ot my professional service, *the identity* (legal name and NPI, license #, or SSN) *of the primary individual rendering each service is reported* in the designated section [].

46.     CMS-1500 expressly warns signing suppliers that, "Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws."

47.     CMS-1500 further warns suppliers and providers that, "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

48.    Suppliers sign the CMS-1500 in box number 31, which includes the following language: "I certify that the statements on the reverse apply to this bill and are made a part thereof."

49.    The billing provider (in this case, HCAT, through its billing department) signs the MCS-1500 in box number 33 by placing its NPI in that box.

50.    As part of making a claim, the billing provider must also truthfully identify the "rendering provider" by NPI number.  The rendering provider is the supplier who actually performed the service for which the billing provider seeks Medicare reimbursement.  The rendering provider information must be input in CMS-1500 box number 24J.

51.    If a billing provider like HCAT inputs incorrect or incomplete information on the CMS-1500, then according to CMS rules the claim "will not be accepted into Medicare's electronic claims processing system and will not be considered filed for purposes of determining timely filing." Medicare Claims Processing Manual, Chapter 1 – General Billing Requirements, § 70.2.3.  Untimely-filed claims are denied. 42 CFR § 424.32(a)(4).  If a claim is incomplete but otherwise timely filed, the billing provider has a period of time, potentially as long as 60 days, to correct the claim form; in such cases, normal claim processing resumes.  Medicare Claims Processing Manual, Chapter 1 – General Billing Requirements, §§ 70.2.3.1 (period to correct), 70.3 (timeliness).

52.    Put another way, a supplier or provider who fails to fill out the CMS-1500 form accurately is not entitled to reimbursement for services to Medicare beneficiaries.

iv.    **Medicare Permits Reimbursements For Laboratory Diagnostic Tests Only When Medically Necessary.**

53.    Generally, Medicare Part B pays only for services that are medically necessary.  To receive reimbursement, suppliers must certify that the provided services were medically required. 42 USC § 1395n(a)(2)(B).

54.    In keeping with this requirement, Laboratory diagnostic tests such as blood tests may be reimbursable if they are "reasonable and necessary."  42 CFR § 411.15(k)(1).  To be reasonable and

necessary, such tests must have been ordered "for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." *Id.*

55.     Additionally, in order to be reasonable and necessary the laboratory diagnostic test must also have been ordered by the treating physician. 42 CFR § 410.32(a). "The physician . . . who orders the service must maintain documentation of medical necessity in the beneficiary's medical record." 42 CFR § 410.32(d)(2)(i). The organizational provider submitting a reimbursement claim for laboratory diagnostic tests must also maintain documentation that the claim accurately reflects the information provided by the ordering physician. 42 CFR § 410.32(d)(2)(ii)(B).

### v.     Medicare Reimburses Annual Wellness Visits—But Not Annual Physicals Or Routine Laboratory Testing.

56.     As part of its public health mission to improve preventative care for Medicare-eligible patients, Medicare Part B reimburses providers for conducting annual wellness visits ("AWVs"). 42 USC § 1395x(hhh)(4)(G); 42 CFR § 410.15(b).

57.     Annual wellness visits are different from routine physical checkups, which Medicare Part B does not cover. 42 CFR §411.15(a) (defining routine physical checkups and excluding from coverage).

58.     AWVs also do not include laboratory diagnostic testing. 42 CFR § 410.15 (specifying scope of AWV services). Specifically, CMS publication ICN 905706 (August 2018) specifically addresses claims for lab tests ordered in connection with an AWV:

> *Are clinical laboratory tests part of the AWV?*
>
> No. The AWV does not include any clinical laboratory tests, but you may make appropriate referrals for such tests as part of the AWV.

### vi.     Providers Must Identify and Return Medicare Overpayments.

59.     Medicare requires providers to exercise reasonable diligence to detect and quantify any overpayments the government may make to that provider. 42 CFR § 401.305. An overpayment

consists of "any funds" that a provider or supplier "received or retained" under Medicare Part B "to which the person, after applicable reconciliation, is not entitled[.]" 42 CFR § 401.303.

60.      HHS and Novitas, the MAC for the Texas region, propound methods providers should use to detect overpayments, such as statistical sampling and audits.

61.      A provider who receives an overpayment "must report and return the overpayment" ordinarily within 60 days of discovery, but no less frequently than annually.  42 CFR 401.305.

### vii.      The False Claims Act

62.      The False Claims Act ("FCA"), 31 U.S.C. §§ 3729 – 3733, prohibits parties from defrauding the Government by "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).  The FCA further prohibits knowingly making a false record or statement that is material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

63.      Liability under the FCA does not require intent to defraud the Government.  31 U.S.C. § 3729(b)(1)(B).  FCA's knowledge requirement is satisfied if a party (a) knew the claim, record or statement was false; (b) acted in deliberate ignorance of the truth or falsity of the claim, record or statement; or (c) acted in reckless disregard of the truth or falsity of the claim, record or statement. 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).

64.      The FCA exposes providers and suppliers to both civil and criminal penalties for Medicare abuse and/or Medicare fraud.

### B.      RELATOR HAS DIRECT KNOWLEDGE OF HCAT'S MEDICARE CLAIMS PRACTICES.

65.      Before accepting employment with HCAT, Relator had worked for an outside consulting company that assigned her to audit HCAT's health care billing practices in October and November 2017.  Relator had also been assigned to perform a follow-up assessment in May 2018 at the request of HCAT's chief executive officer, David Harbour.

66.     On August 13, 2018, Relator accepted full-time employment with HCAT as the executive responsible for revenue cycle.  The revenue cycle process includes submitting claims for reimbursement to Medicare.

67.     As part of her job duties both as a consultant to HCAT and then as HCAT's manager responsible for revenue cycle, Relator reviewed HCAT's denied Medicare claims and interviewed each individual in HCAT's coding and billing department. In the course of those duties, Relator witnessed HCAT violating federal law by intentionally submitting many false forms, certifications, and billing codes to support fraudulent Medicare reimbursement claims.  HCAT used those fraudulent Medicare billing practices to increase payments or obtain payments on claims that otherwise would have been denied.

68.     Relator raised HCAT's fraudulent Medicare claims practices with Jeff Vines, who served as HCAT's chief financial officer until the spring of 2018.  Vines did not correct those practices or, to Relator's knowledge, disclose to the government HCAT's history of receiving Medicare overpayments.

69.     HCAT terminated Relator on January 23, 2019.

## C.     HCAT'S FALSE CLAIMS DEFRAUDED MEDICARE OF MILLIONS OF DOLLARS.

70.     HCAT annually submits about $18 million to $20 million in Medicare claims.  HCAT describes itself as a "full-service primary care group practice with over 40 premier primary care providers serving patients from 6 locations across North Texas."

71.     During the time Relator was responsible for HCAT's revenue cycle, HCAT's leadership refused to commission quarterly internal statistical sampling or claims audits to detect overpayments, as CMS requires. However, a 2018 coding accuracy audit performed by an independent auditor found HCAT coded only 2% of claims correctly, i.e., a 98% rate of submitting ineligible claims.

i.      **HCAT Submitted Claims For Providers Who Did Not Treat The Patients For Whom HCAT Sought Reimbursement.**

a.      *The "reassignment gap": Medicare rules required HCAT to wait for approval before HCAT could bills and receive reimbursement for newly-acquired suppliers' services.*

72.     Like most health care businesses, HCAT tried to obtain Medicare reimbursement funds as quickly as possible.  Avoiding reimbursement delays was a major business objective.

73.     HCAT grew its business by attracting independent suppliers to operate within HCAT. The acquired suppliers contracted with HCAT to allow HCAT to provide billing and claims-submission services for the suppliers. In exchange, the suppliers allowed HCAT to take a portion of those revenues for itself.

74.     As discussed above, HCAT's newly-contracted suppliers had to meet several criteria in order for HCAT to bill their services to Medicare.  First, all suppliers who see Medicare patients must complete the credentialing process with CMS through Novitas as the regional MAC.  At the time new suppliers joined HCAT, some of them were already credentialed and some were not.  Second, each new supplier had to complete the paperwork and procedures to reassign their right to receive Medicare reimbursement payments to HCAT. If either of these requirements was not completed, HCAT could not submit claims for, or receive reimbursements for, the suppliers' services.

75.     It takes the regional MAC up to 90 days (or more) to process a reassignment once an organizational provider submits the paperwork.  It can take significantly longer if the supplier is not Medicare-credentialed in the first place.

76.     Once the MAC processes a reassignment, it honors a "lookback" period of 30 days for reimbursing claims.  The MAC sets that period by establishing an "effective" date of reassignment that is 30 days before the date on which it actually completed the process.

77.     For example, if HCAT completed the reassignment paperwork for new supplier Dr. Smith on the first day of Dr. Smith's contract (Day 1), it might take the MAC until Day 90 to complete

the reassignment. On Day 90, the MAC will set an effective date for reassignment of Dr. Smith's reimbursement right "as of" Day 60. In this example, HCAT would be able to receive reimbursement for claims for Dr. Smith for services performed on Day 60 or later. CMS would still deny claims for reimbursement for services Dr. Smith performed between Day 1 and Day 59.

78.     In the Dr. Smith example, there is a 59-day window in which HCAT cannot receive reimbursement for services to Medicare patients. (Dr. Smith could lawfully submit claims directly but a significant reason suppliers join organizational providers like HCAT is for billing support in the CMS claims submission process; and HCAT contracts with suppliers to process all of their claims.)

79.     In practice, HCAT experienced much longer reimbursement gaps because it and the acquired suppliers often failed to request reassignment on the first day. HCAT frequently took months to submit reassignment paperwork and begin the 90-day process.

80.     Many organizational providers have to contend with this reimbursement "gap" problem. The normal, legal solution is for acquired suppliers to stop seeing Medicare beneficiaries during the gap period, and instead see only privately insured patients.[3]

>    b.     *HCAT avoided the reassignment gap by substituting the names of properly credentialed suppliers for those who actually rendered services to Medicare patients.*

81.     In the course of her interviews with individual HCAT coding and billing staff, Relator discovered that followed an established policy for dealing with the reassignment gap in a different, altogether fraudulent way.

82.     Two members of HCAT's "coding team" told Relator that HCAT's standard policy was to substitute properly credentialed and contracted physicians on claims where services were

---

[3] Medicare Part B permits providers to submit claims up to one year after the date of service. But because the "effective date" of the reassignment establishes the earliest date of services for which the organizational provider can receive reimbursement, the one-year scope does not solve the reassignment gap.

actually provided by a physician (or nurse practitioner) who was not eligible for Medicare reimbursement.

83.     Relator investigated this troubling information.  She discovered that HCAT had established billing policies that required its billing staff to enter the names of one of its "founding" physicians—Charles L. Powell, M.D., Maria Biard, M.D., Mark Anderson, M.D., David Deems, M.D., Terrance Feehery, D.O., and Walter Gaman, M.D (collectively, "Founding Physicians")—on CMS-1500 forms in boxes 24J and 31 when the Founding Physician had not seen the patient.

84.     In principle, a Medicare beneficiary might receive services from "Doctor A" at HCAT "Clinic A." However, under circumstances explained below, HCAT's policy was to submit the claim with a Founding Physician's name in boxes 24J and 31 instead of the actual treating physician where the treating physician was ineligible to receive Medicare reimbursements or had not yet reassigned their reimbursement rights to HCAT.

85.     For example, in 2018 HCAT acquired a practice located in Southlake, Texas.  For several months following the acquisition, but before Novitas approved the reassignment of the Southlake professionals' reimbursement rights to HCAT, HCAT submitted many claims for Medicare reimbursement on behalf of the Southlake suppliers—Drs. Cody Mihills, Wyatt Webb, and Kimberly Ward, and nurse practitioner Lana Heath—that contained the NPIs for Charles L. Powell, M.D. or Maria Biard, M.D. in boxes 24J or 31, or both.  Neither Dr. Powell nor Dr. Biard saw the patients.

86.     In the Southlake example and in many similar instances involving other practices and suppliers, every HCAT-submitted CMS-1500 that listed the Founding Physicians as rendering providers in box 24J was false and misleading because the Founding Physician was not in fact the rendering provider.

87.     Additionally, by adding his or her name to CMS-1500 box 31, the Founding Physician whose name appeared there also falsely certified that: (i) "the information [in CMS-1500 box 24J] is

true, accurate and complete; (ii) the Founding Physician had (or would) provide "sufficient information required to allow the government to make an informed eligibility and payment decision;" (iii) the services were . . . "personally furnished by me" or furnished "under my direct supervision"; and iv) for each service "the identity . . . of the primary individual rendering each service is reported" in box 24J.[4]

88.    HCAT's billing department, in accordance with its established policy, then entered HCAT's organizational provider NPI number in box 33 of the CMS-1500.  By doing so, HCAT was certifying that the information in CMS-1500 boxes 24J and 31 were accurate and supported by HCAT's internal documentation.

89.    That certification was necessarily false because the supporting medical records clearly demonstrated that the actual rendering providers were different from the persons identified in boxes 24J and 31.

90.    Each of these misstatements on each of the affected CMS-1500s was an independent basis for Medicare to refuse payment for those claims.

91.    Greed motivated HCAT to substitute a Founding Physician for the actual rendering provider.  Rather than wait for the MAC to complete the reassignment process, HCAT simply told Medicare that one of the credentialed Founding Physicians had treated the patient.  The scheme had three advantages for HCAT:   (i) it allowed the acquired suppliers to continue seeing Medicare beneficiaries while uncredentialed or not yet assigned to HCAT; (ii) it eliminated the "gap" period created by CMS to protect the government from fraud and abuse; and (iii) it speeded HCAT's revenues

---

[4] Medicare allows providers to identify non-treating suppliers in boxes 24J or 31 under specified circumstances, but those exceptions require *inter alia* that the non-treating supplier be in a position of direct supervision over the person providing the service. The Founding Physicians did not meet the criterial for having direct supervision.  Among other things, they were not on site where the suppliers treated the patients.

by allowing HCAT to submit and collect claims during the 30-day lookback period immediately instead of waiting until after reassignment or credentialing and then making claims on a retroactive basis.

92.     At minimum, HCAT's fraudulent policycaused Medicare to pay HCAT for services that occurred during the "gap" period, even though HCAT had no right to those reimbursements.

93.     But worse, when the acquired providers were not yet credentialed with Medicare, HCAT's fraudulent policy meant Medicare paid for services performed by un-vetted doctors and professionals. It also frustrated CMS's goal of documenting and auditing the quality of services provided to Medicare beneficiaries because HCAT's fraud caused the Medicare billing records not to match the beneficiaries' medical charting.

> c.    *HCAT's CEO and Compliance Officer refused to investigate HCAT's fraudulent practice when Relator brought it to their attention.*

94.     In May 2018, when Relator discovered HCAT's policy of replacing the actual rendering supplier with a Founding Physician, she immediately spoke with HCAT compliance officer Kristian Daniels and HCAT chief executive officer David Harbour. Relator informed Daniels and Harbour that HCAT's policy constituted Medicare fraud.

95.     In that conversation, Harbour asked Relator why it was a problem to use credentialed physicians' NPIs in place of the acquired suppliers' NPIs. When Relator explained the applicable CMS rules, Harbour's response was to ask how HCAT could get money for the work by the non-credentialed or un-reassigned suppliers. Relator explained HCAT could not. Relator explained that HCAT either needed to stop the acquired suppliers from seeing Medicare patients until the procedures were completed, or HCAT needed to understand the services would not be Medicare reimbursable.

96.     Relator also advised Daniels and Harbour that CMS rules required HCAT to audit its reimbursement history based on HCAT's awareness that its policies had caused Medicare to over-reimburse HCAT. Relator also advised Daniels and Harbour on multiple occasions that HCAT had an obligation to repay any Medicare overpayments to the government.

97.     Daniels, Harbour, and HCAT did not conduct that audit, nor did HCAT make any attempt to repay the Medicare overpayments it had received.

**ii.     HCAT Falsely Claimed Physicians Provided Services Non-Physicians Provided.**

98.     HCAT also submitted false supplier information to increase the total amount of reimbursements from Medicare.

99.     CMS reimburses services provided by non-physicians at a lower rate than for physicians. For example, nurse practitioners bill at a rate equal to 85% of the reimbursement allowed for a physician for the same service.

100.     In order to maximize reimbursements, HCAT established a policy of "split billing," whereby HCAT "split" claims for beneficiary office visits handled by non-physicians from other services associated with the same office visit. HCAT's policy was for its billing coders to apply the NPI for a physician to those other services even though a non-physician had ordered the service. This had the effect of increasing the total reimbursement amount for the office visit and attendant service.

101.     For example, if "Nurse Practitioner Florence" handled a beneficiary's office visit for flu-related symptoms and gave a steroid injection, CMS rules require the organizational provider to bill both the office visit and the injection under Nurse Practitioner Florence's NPI.[5] CMS then reimbursed both the office visit and the injection at 85% of the physician rate.

102.     But in this example, HCAT's policy was to bill the office visit under Nurse Practitioner Florence's NPI (85%) and "split" the injection to a physician's NPI (100%). That billing procedure violates CMS rules because the physician did not order or supervise the injection; Nurse Practitioner Florence ordered and performed the injection acting within her own scope of service.

---

[5] Medicare Benefit Policy Manual, Ch. 15 § 60.1 (defining physician "incident to" services as those taking place under the physician's direct supervision); § 200(B)(1-2) (providing coverage for nurse practitioner services and "incident to" services the nurse practitioner directly supervises). In the example, the physician did not see the patient. Therefore, neither the office visit nor the injection are "incident to" the physician's services and billable to the physician's NPI at the 100% rate.

103.    In her discussions with HCAT billing staff, Relator became aware of repeated instances of "split" billing where HCAT billed ancillary services such as injections to physicians even though a non-physician had treated the patient.  A typical practice would be to bill the office visit with the nurse practitioner with CPT code 99213 (with an 85% reimbursement based on the nurse practitioner's NPI) but then bill the injection the nurse practitioner ordered with CPT codes 96372 & J1030 to a physician (with a 100% reimbursement based on the physician's NPI).

104.    On information and belief, the source of which is Relator's discussions with HCAT coding staff, Jeff Vines initiated the split billing policy.  Vines left HCAT in the spring of 2018.  Relator does not know when Vines created the policy but on information and belief, the source of which is HCAT coding staff, it had been in place for years.

105.    Relator spoke with HCAT chief executive officer Harbour about the split billing policy and obtained his approval to stop it in September 2018.

106.    Despite Relator's urging, however, HCAT and Harbour did not audit its reimbursement history prior to September 2018 based on Harbour's and HCAT's awareness that the split billing policy had caused Medicare to over-reimburse HCAT.  HCAT and Harbour also did not make any attempt to repay the Medicare overpayments HCAT had received.

iii.    **HCAT Improperly Ordered And Claimed Laboratory Diagnostic Tests That Were Not Medically Necessary.**

    a.    *The "PEP Department": HCAT improperly ran batteries of uncovered laboratory tests in hope they would reveal a covered basis for ordering them after the fact.*

107.    Medicare does not cover annual "physical examinations" for beneficiaries.  Instead, Medicare Part B covers Annual Wellness Visits ("AWVs").  An AWV is a visit with a patient's primary care physician to create or update a patient's personalized prevention plan to help prevent illness based on the patient's current health and risk factors.

108.    CMS rules comprehensively define the particular procedures that comprise a covered AWV.[6] Those covered procedures specifically do not include diagnostic laboratory tests such as blood tests, urinalysis, x-rays, or the like.

109.    In order for Medicare to cover a diagnostic laboratory test, the test must be medically necessary based on the patient's condition.  Preventative laboratory tests are not covered.

110.    However, as Relator learned during her initial assessment of HCAT's billing and coding practices during the fall of 2017, HCAT developed a method for obtaining Medicare reimbursements for preventative diagnostic laboratory tests regardless of whether the patient presented a need for them.

111.    Specifically, in sitting with members of the coding team to review their process, Relator noticed that a post-it note on one of the computers reminded the user of HCAT's policy that if Medicare does not reimburse for code 99397 (the annual physical code, which is covered by Medicare Advantage Plans, but not by Medicare Part B), change the code to 99213 (a code used for established patient-initiated office visits for the evaluation of chronic conditions, which is typically covered by Medicare Part B).

112.    When Relator inquired about the note, she learned that HCAT maintained a so-called "Pre-Examination Preparation Department" or "PEP Department" for obtaining Medicare reimbursements for preventative diagnostic laboratory tests regardless of whether the patient presented a need for them.

113.    The PEP Department ordered diagnostic laboratory tests for Medicare patients in connection with the patient's AWV, but HCAT billed those tests as if the patient had presented a medical condition or complaint that required the test.  In that way, HCAT was able to collect from

---

[6] For example, during an AWV the treating physician checks the patient's vitals, updates the medical history and medications, screens for cognitive issues, and provides advice and referrals.

Medicare for both the AWV and the laboratory tests even when the test would not have been indicated by the AWV itself.

114.    Here is an example of how the PEP fraud worked.  When Patient X was due for her AWV, HCAT scheduled her for two visits a few days apart.  On the first visit, Patient X would see the PEP Department, which would run a battery of laboratory tests.  A medical assistant would open an "encounter" on Patient X's chart for the AWV visit, but not close the encounter at the end of the testing visit.  Then, when Patient X returned for the second visit, Doctor Jones would see Patient X, continue the charted encounter, and perform the usual AWV services.  But Doctor Jones also had the benefit of the test results from the laboratory testing conducted during the PEP visit.  Because Medicare beneficiaries are older people with increasing medical needs, Doctor Jones would usually be able to find something notable in laboratory results that indicated a need for further services.  Likewise, Doctor Jones could usually find something in the patient's medical history or the covered AWV procedures with which to justify the notable diagnostic test after the fact.  Because the chart reflected a single encounter made up of both the PEP visit and the AWV visit, the billing claim to Medicare misleadingly made it look like Doctor Jones had: (i) detected an issue during the AWV; (ii) consequently ordered the laboratory test; and then (iii) confirmed the suspicion and offered further services.

115.    The problem with this PEP approach was that it relied on running the tests and finding a medically significant result *first*, but falsely billing Medicare as though something that came up during the AWV had caused the doctor to order the test *second*.  The result was that HCAT obtained Medicare reimbursement on many more claims for laboratory tests than the AWV rules would have supported if HCAT had followed them.

116.    To be sure, it is not uncommon for AWV visits to result in follow-up work that includes laboratory testing.  In those ordinary cases, the provider bills both for the AWV and the

additional medically necessary services rendered to treat or diagnose whatever patient condition the provider observes.  Medicare covers those services because they relate to a patient need.

117.     But HCAT's approach put the cart before the horse.  HCAT ran tests no matter what—and then looked for a way to justify billing them.

118.     Worse, HCAT manipulated the medical charts for Medicare beneficiaries to cover up the improper approach.  If HCAT had charted appropriately, it would have coded the patient's "PEP" visit and the follow-up AWV visit as separate encounters.  Doing that would have exposed the PEP visit for what it was:  a visit for the purposes of administering tests without an instigating patient complaint or doctor diagnosis.  By charting the two visits as if they were a single AWV visit, HCAT was able to mingle the claim codes on the CMS-1500 and avoid scrutiny from CMS and the MAC.

        *b.*      *HCAT's CEO, CFO, and Compliance Officer knew the PEP Department claims had allowed HCAT to receive significant overpayments from Medicare, but refused to quantify or return the overpayments.*

119.     During her employment with HCAT, Relator became aware of the PEP Department's services and claims for Medicare reimbursement.  Relator took it upon herself to investigate whether those claims were permissible under CMS rules.

120.     Relator also worked with two HCAT employees, Heather Brown and Lisa Miseles-Huff, to examine HCAT's PEP policies and process.

121.     Relator and Brown concluded that the PEP Department's practices were not permissible under CMS rules.  Together, they met with HCAT Executive Vice President Charles Powell to discontinue the practice.  Relator and Brown also directed that the suppliers who met patients for the second visit needed to begin a new note in the medical chart.  Relator and Brown also directed the practice managers to ensure that the visit being coded as the AWV be conducted by a medical professional, such as a doctor, not a medical assistant.

122.     Relator and Miseles-Huff emailed Daniels, as the HCAT compliance officer, to advise her that the PEP Department's practices and claims violated CMS rules.  Daniels ultimately confirmed that the PEP Department's practices were impermissible and directed that they be stopped.

123.     On information and belief, HCAT stopped the impermissible PEP Department practices and claims in the fall of 2018.

124.     Shortly after Daniels gave instructions for HCAT to stop the improper PEP practices, Relator asked Daniels if Relator should prepare an analysis to support disclosure to CMS of PEP-related overpayments. Daniels said she would get back to Relator.  Daniels did not respond further.

125.     Having not received a response from Daniels about what Relator understood to be HCAT's legal duty to report overpayments, Relator reached out to Daniels again and pressed the issue. This time, Daniels told Relator that she had spoken with CEO Harbour, and CFO Jessica Vogt, and that HCAT's leadership had decided not to refund the overpayments and "take the risk."

iv.     **HCAT Improperly Submitted Claims When A Medical Assistant Had Documented The Medical Chart—Not The Treating Physician or Nurse Practitioner As Required.**

126.     Under CMS rules (to say nothing of other professional standards) some portions of a patient's medical records can be documented by a medical assistant, but other portions must be completed by the medical professional.

127.     At HCAT, the electronic medical records system records the initials of the employee who fills in each portion of the chart.

128.     In the fall of 2018, after an independent coding audit found HCAT's coding accuracy rate to be an appallingly low 2% accurate, Relator initiated a compliance review of HCAT's medical records.

129.     During that review, Relator discovered that medical assistants frequently completed portions of patient charts that a medical professional needed to complete.

130.     Relator raised this documentation flaw with HCAT leadership, which took no action to correct it.

## V.
## CLAIMS

### COUNT I
### Violation of the False Claims Act 31 U.S.C.A. § 3729(a)(1)(A) (HCAT and Vine)

131.     This is a claim for treble damages and penalties under the False Claims Act.

132.     By virtue of the acts described above, Defendants HCAT and Vine knowingly presented or caused to be presented a false or fraudulent claim for payment approval in violation of 31 U.S.C.A. § 3729 (a)(1)(A).

133.     The Government, and specifically the Medicare program, unaware of the falsity of these claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendants' fraudulent and illegal conduct.

134.     By reason of Defendant's acts, the Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

135.     The Government is further entitled to penalties for each violation described herein as allowed by law.

### COUNT II
### Violation of the False Claims Act 31 U.S.C.A. § 3729(a)(1)(B) (HCAT and Vine)

136.     This is a claim for treble damages and penalties under the False Claims Act.

137.     By virtue of the acts described above, Defendants HCAT and Vines knowingly caused to be made or used a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C.A. § 3729 (a)(1)(B).

138.     The Government, and specifically the Medicare program, unaware of the falsity of these records and/or statements made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendants' fraudulent and illegal conduct.

139.    By reason of Defendant's acts, the Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

140.    The Government is further entitled to penalties for each violation described herein as allowed by law.

### COUNT III
### Violation of the False Claims Act 31 U.S.C.A. § 3729(a)(1)(G) (All Defendants)

141.    This is a claim for treble damages and penalties under the False Claims Act.

142.    By virtue of the acts described above, Defendants knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, 31 U.S.C.A. § 3729 (a)(1)(G).

143.    Having fraudulently received payments or overpayments from the Government, and specifically the Medicare program, Defendants knowingly concealed such payments or overpayments and refused to refund such payments to the Government.

144.    By reason of Defendant's acts, the Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

145.    The Government is further entitled to penalties for each violation described herein as allowed by law.

### COUNT IV
### Violation of the False Claims Act 31 U.S.C.A. § 3729(a)(1)(C) (All Defendants)

146.    This is a claim for treble damages and penalties under the False Claims Act.

147.    By virtue of the acts described above, Defendants conspired to commit violations of § 3729(a)(1)(A), (B), and/or (G) in violation of 31 U.S.C.A. § 3729 (a)(1)(C).

148.    By reason of Defendant's acts, the Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

149.     The Government is further entitled to penalties for each violation described herein as allowed by law.

## COUNT IV
### Violation of the Medicare and Medicaid Integrity Provisions 42 U.S.C.A. § 1320a-7k(d)
### (All Defendants)

150.     By virtue of the acts described above, Defendants violated the Medicare and Medicaid Integrity Provisions 42 U.S.C.A. § 1320a-7k(d).

151.     Specifically, 42 U.S.C.A. § 1320a-7k(d) provides as follows:

> (d) REPORTING AND RETURNING OF OVERPAYMENTS
> (1) IN GENERAL
> If a person has received an overpayment, the person shall—
>> (A) report and return the overpayment to the Secretary. . . ; and
>> (B) notify the Secretary. . . in writing of the reason for the overpayment.
> (2) DEADLINE FOR REPORTING AND RETURNING OVERPAYMENTS
> An overpayment must be reported and returned under paragraph (1) by the later of—
>> (A) the date which is 60 days after the date on which the overpayment was identified; or
>> (B) the date any corresponding cost report is due, if applicable.

152.     Having been notified by Relator of the overpayments HCAT received from Medicare, Defendants failed and refused to report and return the overpayments to the Government.

153.     The Government has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

154.     The Government is further entitled to penalties for each violation described herein as allowed by law.

## VI.
### PRAYER

155.   Relator asks the Court to enter judgment as follows:

    a.    Ordering Defendant to cease and desist from violating the False Claims Act;

    b.    Awarding an amount equal to three times the amount of damages the Government has sustained plus civil penalties for each violation of the False Claims Act;

    c.    Awarding Relator all costs of this action, including attorneys' fees and expenses; and

    d.    Awarding Relator such other relief as the Court deems just and proper.

Respectfully submitted,

**JOHNSTON PRATT PLLC**

By: /s/   Rob Gifford
    Robert W. Gifford
    State Bar No. 24093543
    rgifford@johnstonpratt.com

    Catherine E. (Kate)Gaither
    State Bar No. 24059793
    kgaither@johnstonpratt.com

1717 Main Street, Suite 3000
Dallas, Texas 75201
(214) 974-8000 (Telephone)
(972) 474-1750 (Facsimile)

ATTORNEYS FOR RELATOR

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

CARRIER

PICA | | PICA

**1. MEDICARE** (Medicare#) **MEDICAID** (Medicaid#) **TRICARE** (ID#/DoD#) **CHAMPVA** (Member ID#) **GROUP HEALTH PLAN** (ID#) **FECA BLK LUNG** (ID#) **OTHER** (ID#) | **1a. INSURED'S I.D. NUMBER** (For Program in Item 1)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE MM DD YY   SEX M ☐ F ☐ | 4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED  Self ☐ Spouse ☐ Child ☐ Other ☐ | 7. INSURED'S ADDRESS (No., Street)

CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE

ZIP CODE | TELEPHONE (Include Area Code) ( ) | | ZIP CODE | TELEPHONE (Include Area Code) ( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous)  YES ☐ NO ☐ | a. INSURED'S DATE OF BIRTH MM DD YY   SEX M ☐ F ☐

b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT?  YES ☐ NO ☐  PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT?  YES ☐ NO ☐ | c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  YES ☐ NO ☐  If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED _____ DATE _____

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED _____

PATIENT AND INSURED INFORMATION

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM DD YY   QUAL. | 15. OTHER DATE QUAL. MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE | 17a. | 17b. NPI | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES MM DD YY   MM DD YY  FROM TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB?  YES ☐ NO ☐   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)   ICD Ind. | 22. RESUBMISSION CODE ___ ORIGINAL REF. NO.
A. ___ B. ___ C. ___ D. ___
E. ___ F. ___ G. ___ H. ___
I. ___ J. ___ K. ___ L. ___ | 23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS   MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | NPI | |
| 2 | | | | | | | | NPI | |
| 3 | | | | | | | | NPI | |
| 4 | | | | | | | | NPI | |
| 5 | | | | | | | | NPI | |
| 6 | | | | | | | | NPI | |

PHYSICIAN OR SUPPLIER INFORMATION

25. FEDERAL TAX I.D. NUMBER   SSN ☐ EIN ☐ | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back)  YES ☐ NO ☐ | 28. TOTAL CHARGE $ | 29. AMOUNT PAID $ | 30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED _____ DATE _____ | 32. SERVICE FACILITY LOCATION INFORMATION  a. | b. | 33. BILLING PROVIDER INFO & PH # ( )  a. | b.

NUCC Instruction Manual available at: www.nucc.org | **PLEASE PRINT OR TYPE** | APPROVED OMB-0938-1197 FORM 1500 (02-12)

# EXHIBIT A