IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA, *ex*     §
*rel.* CHERYL TAYLOR,               §
                                   §
        Plaintiff,                 §
                                   §
v.                                 §        Civil Action No. 3:19-CV-2486-N
                                   §
HEALTHCARE ASSOCIATES              §
OF TEXAS, LLC, *et al.*,           §
                                   §
        Defendants.                §

## MEMORANDUM OPINION AND ORDER

This order addresses Defendants'[1] motion to strike and to dismiss [112].   The

Court concludes that Relator Cheryl Taylor's Second Amended Complaint[2] ("2AC")

adequately states a claim for relief under the False Claims Act and denies the motion.

### I. ORIGINS OF THE DISPUTE

Taylor alleges that she observed HCAT[3] and its agents, the individual defendants,

employ fraudulent Medicare billing practices.   HCAT was founded and managed by

Defendants Powell, Deems, Gaman, Feehery, and nondefendant Dr. Maria Baird (the

"Founding Physicians").   2AC ¶ 75.   Taylor first worked for HCAT as an outside

consultant.   *Id.* ¶ 76.   She audited HCAT's healthcare billing practices in late 2017 and

---

[1] The Second Amended Complaint ("2AC") names Healthcare Associates of Texas, LLC, Healthcare Associates of Irving, LLP, David Harbour, Jeff Vines, Kristian Daniels, Dr. Charles L. Powell, Dr. David Deems, Dr. Walter Gaman, and Dr. Terrence Feehery.
[2] The 2AC is redacted and docketed at [89] and available in full under seal at [112-1].
[3] The parties refer to Healthcare Associates of Texas, LLC and Healthcare Associates of Irving, LLP ("HCA-Irving") collectively as "HCAT."   *See* 2AC ¶¶ 74–76.

provided a follow-up assessment in May 2018.  *Id.* at ¶ 76.  In August 2018, Taylor

accepted full-time employment with HCAT as the executive responsible for its revenue

cycle.  *Id.* ¶ 77.  Throughout her tenure at HCAT, Taylor's duties included submitting

claims for reimbursement to Medicare, reviewing denied claims, and interviewing every

billing and coding department employee.  *Id.* ¶¶ 77–78.  According to Taylor, numerous

HCAT policies required billing staff to submit claims for greater reimbursement than

Medicare regulations allowed.  Allegedly:

1. HCAT submitted claims with coding errors and without complete
   medical records to avoid delays in reimbursement.  *Id.* ¶¶ 83–91.

2. HCAT submitted claims that named a treating physician who did not
   actually provide or supervise the claimed service in order to skirt
   credentialing requirements, secure higher reimbursement rates, and
   obtain reimbursement for nonreimbursable services.  *Id.* ¶¶ 5, 7, 92–
   161, 208, 212, 221–225.

3. HCAT also obtained reimbursement for nonreimbursable services by
   ordering unnecessary tests and services and manipulating billing codes
   and chart data.  *Id.* ¶¶ 6, 162–214.

4. HCAT officials refused to return overpayments.  *Id.* ¶¶ 215–220.

Taylor contends that she notified HCAT personnel, including compliance officer Kristian

Daniels, CEO David Harbour, and then-CFO Jeff Vines, of the problematic practices.  *Id.*

¶¶ 79, 91, 117–20, 160–61, 218.  To her knowledge, HCAT did not correct its practices

or disclose them to the government.  *Id.* ¶ 79.  HCAT terminated Taylor in January 2019.

*Id.* ¶ 80.

Taylor filed this *qui tam* action alleging several counts under the False Claims Act

("FCA"), 31 U.S.C. §§ 3729(a)(1).  She subsequently sought leave to amend because the

Government's investigation and early discovery revealed that HCA-Irving should be named as a defendant. Rel.'s Unopp. Mot. Leave 1 [57]. Defendants did not oppose the filing of the First Amended Complaint ("1AC") [58]. *Id.* at 6; *see also* Joint Stipulation [62] (applying pending motion to dismiss briefing to amended complaint). But Defendants now argue that Taylor's additional amendments impermissibly rely on material obtained in discovery, and they ask the Court to strike portions of the 2AC as well as dismiss it entirely for failure to state a claim.

## II. LEGAL STANDARDS

### A. Motion to Strike

Under Federal Rule of Civil Procedure 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). Granting a motion to strike is a drastic remedy that should be used sparingly. *Augustus v. Bd. of Pub. Instruction*, 306 F.2d 862, 868 (5th Cir. 1962) (citing *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)). The Court should strike a matter as impertinent or immaterial only when it has "no possible relation to the controversy." *Augustus*, 306 F.2d at 868 (citing *Brown & Williamson Tobacco Corp.*, 201 F.2d at 822). Beyond the scope of Rule 12(f), courts also retain inherent powers to "fashion an appropriate sanction for conduct which abuses the judicial process," including striking material as impermissible. *United States v. SouthEast Eye Specialists, PLLC*, 570 F. Supp. 3d 561, 571 (M.D. Tenn. 2021) (quoting *Royce v. Michael R. Needle P.C.*, 950 F.3d 939, 953 (7th Cir. 2020)) (internal quotations omitted).

### B.  Motion to Dismiss for Failure to State a Claim

When addressing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the plaintiff has asserted a legally sufficient claim for relief.  *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).  "When reviewing a motion to dismiss, a district court must consider the complaint in its entirety, as well as … documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (internal quotation marks omitted).

A viable complaint includes "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A court generally accepts well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff.  *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012).  The facts are "taken collectively" rather than "scrutinized in isolation."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).  But a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level … on the assumption that all the allegations in the complaint are true."  *Id.* (internal citations omitted).  A complaint is plausible if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Claims of misconduct are "merely conceivable and not plausible" if their supporting facts have a more obvious legal

MEMORANDUM OPINION AND ORDER – PAGE 4

explanation.  *U.S. ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892, 897 (5th Cir. 2020) (unpub) (quoting *Iqbal*, 556 U.S. at 682).

Additionally, Rule 9(b) requires that plaintiffs alleging fraud or mistake state their claims with particularity.  FED. R. CIV. P. 9(b).  And because Rule 9(b) "stand[s] as a gatekeeper to discovery," *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009), plaintiffs must be able to set forth at least "the 'who, what, when, where, and how' of the alleged fraud" largely without that benefit.  *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (quoting *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)).  Plaintiffs may not "make an end run around" the requirement that fraud be pled with particularity by "rest[ing] [their complaints] primarily on facts learned through the costly process of discovery."  *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 380 (4th Cir. 2008).  However, "conditions of a person's mind" may be alleged generally.  FED. R. CIV. P. 9(b).  Further, when "facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge," plaintiffs may plead their allegations "on information and belief," but they "must set forth a factual basis for such belief."  *Thompson*, 125 F.3d at 903.  Courts are careful to ensure that this exception is not misused as a "license to base claims of fraud on speculation and conclusory allegations."  *Id.* (quoting *Tuchman v. DSC Comms. Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)) (internal quotations omitted).

### III.  THE COURT DENIES THE MOTION TO STRIKE

The heightened pleading requirements of Rule 9(b) apply in FCA cases.  *U.S. ex rel. Russell v. Epic Healthcare Mgmt. Grp.*, 193 F.3d 304, 308 (5th Cir. 1999*), abrogated*

*on other grounds*, *U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928 (2009). Accordingly, courts sometimes strike discovery-based amendments to complaints where the plaintiffs cannot otherwise satisfy Rule 9(b).  *See, e.g.*, *Bingham v. HCA, Inc.*, 783 F. App'x 868, 876 (11th Cir. 2019) (unpub.) (affirming striking under Rule 12(f)); *cf. Southeast Eye* Specialists, 570 F. Supp. 3d at 571 (finding striking for impermissibility outside the scope of Rule 12(f), then declining to strike under inherent powers).  Doing so prevents plaintiffs from being able to litigate deficient claims by "learn[ing] the complaint's bare essentials through discovery."  *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 n.24 (11th Cir. 2002).

But not all information obtained during discovery "circumvent[s] the purpose of Rule 9(b)," as concerned the *Bingham* court.  783 F. App'x at 876.  District courts across the country regularly allow relators to use documents obtained from governmental entities in their amended pleadings.  *See, e.g.*, *U.S. ex rel. King v. Solvay S.A.*, 2010 WL 2851725, at *1 (S.D. Tex. 2010) ("[*Russell*] necessitates that relators be allowed to use the subpoenaed documents that were shared by the States in their amended complaint."); *U.S. ex rel. Underwood v. Genentech, Inc.*, 720 F. Supp. 2d 671, 680 (E.D. Pa. 2010) (Defendant's authority "precludes only amendments to a *qui tam* complaint based on discovery obtained directly from the *qui tam* defendant," but "no authority . . . bar[s] amendments based on discovery the relator obtained from the Government. Indeed . . . courts have suggested just the opposite."); *United States v. Walgreen Co.*, 2018 WL 6258892, at *2 (C.D. Cal. 2018) (following *Genentech* and collecting cases for proposition that courts routinely allow discovery-based amendments in other contexts);

MEMORANDUM OPINION AND ORDER – PAGE 6

*Vassallo v. Rural/Metro Corp.*, 2017 WL 4570706, at \*5 (D. Ariz. 2017) ("[C]ourts that have addressed the present situation appear united in their allowance of amended complaints based on information gleaned from government investigations."); *cf. U.S. ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 319 F. Supp. 3d 747, 752 (S.D.N.Y. 2018) (noting that precedent supported allowing amendment where "relator already possessed the information from the government to be used in the amendment").

The 2AC cites to "documents obtained from Defendants and third parties." Defs.' Mot. Dismiss & Strike 14 [112] (quoting Rel.'s Mot. Leave File Am. Compl. 1 [71]). Those third-party documents could fall outside the scope of the Rule 9(b) exclusion. However, Defendants ask the Court for a blanket strike of all discovery-sourced allegations without identifying and demonstrating the impermissibility of each paragraph's source material.[4] Defs.' Mot. Dismiss & Strike 16. "[A]s the one bringing the motion, it is [Defendants'] burden to establish what they describe as 'impermissible' use, and they have not carried that burden." *SouthEast Eye Specialists*, 570 F. Supp. 3d at 570–71. The Court denies the motion to strike.

## IV. THE COURT DENIES THE MOTION TO DISMISS

To state a claim under the FCA, a plaintiff must allege that: (1) "there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *U.S. ex rel. Longhi v. United States*, 575

---

[4] The Court will not consider an argument raised for the first time in a reply. *See, e.g.*, *Springs Indus., Inc. v. Am. Motorists Ins. Co.*, 137 F.R.D. 238, 239 (N.D. Tex. 1991).

F.3d 458, 467 (5th Cir. 2009) (quoting *Wilson*, 525 F.3d at 376).  "Invocation of Rule 12(b)(6) places the burden on the movant to show that dismissal is warranted," so the Court addresses only the elements and claims that Defendants argue are deficiently pled. *Oliver v. Tower Semiconductor*, 2023 WL 2804390, at *2 (W.D. Tex. 2023).

### A. Plausibility

Defendants first argue that the 2AC lacks plausibility as to three of Taylor's theories of misconduct.  The Court considers each in turn.

### 1. Claims for Services Performed by Noncredentialed Providers. – Medicare

regulations require that healthcare practitioners enroll as "suppliers," 42 C.F.R. § 400.202, before they can receive payments for their services.  *Id.* §§ 424.500, 424.505. The enrollment requirements ensure that suppliers are properly licensed and compliant with state and local regulations.  *Id.* §§ 424.510(d)(2)(iii)(A), (d)(3).  When physicians and nonphysician practitioners submit Form CMS-855I enrollment applications, their billing privileges become effective on the later of either the date of their subsequently-approved application or the date they "first began furnishing services at a new practice location."  *Id.* §§ 424.520(d)(1), (d)(2)(i) – (ii).  There is also a "lookback period" — "if circumstances precluded enrollment in advance of providing services to Medicare beneficiaries," then they may retrospectively bill for services "[t]hirty days prior to their effective date."  *Id.* § 424.521(a)(1)(i).

Importantly, a supplier's enrollment application must be approved to receive payment.  *Id.* § 424.505.  To obtain reimbursement for services provided after the effective date but before actual approval, suppliers must submit claims retrospectively.

Suppliers can reassign their payment rights to their employers in some circumstances, *see id.* §§ 424.73, 424.80, and the same credentialing requirements apply to the employers' applications for reassignment. *See id.* §§ 424.80(c), 424.500. Employers must wait for reassignment to be approved in order to bill for their suppliers' services, even if their suppliers are properly credentialed and could seek reimbursement themselves.

The FCA creates penalties for "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" as well as "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A) – (B). Taylor alleges that HCAT intentionally avoided credentialing regulations by requiring billing staff to submit claims during the "gap" period prior to the treating practitioners' enrollment and reassignment approvals. 2AC ¶¶ 101–04. Because the services were not yet reimbursable, and indeed may never have been if rendered prior to the effective date and lookback period, HCAT substituted the actual providers' names with the names of credentialed physicians who never actually saw the patients. *Id.* ¶ 102–03. Specifically, Taylor contends that HCAT's policy was to seek early reimbursement by billing such services as if provided by the Founding Physicians. *Id.* ¶¶ 103, 114.

The 2AC states these allegations plausibly. Taylor identifies numerous practitioners and their enrollment and assignment dates for whom HCAT allegedly submitted improperly early and misleading claims that named Founding Physicians instead. *Id.* ¶¶ 105–07. For example, HCAT allegedly submitted "many claims for Medicare reimbursement on behalf of" two doctors and one nurse at the Southlake

practice before their reassignments were approved, using the national provider identifiers ("NPIs") of Powell and Baird, though neither ever saw the patients. *Id.* ¶ 105.

Defendants' legal explanations of the conduct are unavailing. Even if the services could have been reimbursed, enrollment or reassignment must still be approved before Medicare will pay a claim. *See* 42 C.F.R. §§ 424.500, 424.505. Further, nothing in the 2AC makes it obvious that the services were rendered "incident to" the named physicians' care or under their supervision, which would permit billing to their NPIs. *See infra* Part IV.A.2. Indeed, the 2AC explicitly states that the named physicians did not see the patients, ¶ 105, and claim data from 2015 to 2021 added to the 2AC weakens the possibility of proper "incident to" billing. According to Taylor, Powell was designated as rendering provider on lab-associated claims much more often than any other HCAT physician each year. *See id.* ¶¶ 133–34, 140. And despite stepping back from practice in 2018 to focus on his administrative role, ¶ 129, his figures skyrocketed in 2018. In 2019, 2020, and 2021, the other Founding Physicians claims averaged out to fewer than 500 in each year. See *id.* ¶¶ 133–34. Powell allegedly submitted 13,471 in 2019 — despite submitting claims for only 88 office visits, *id.* ¶ 5. — 14,021 in 2020, and 15,052 in 2021. *Id.* ¶ 133. The 2AC creates a plausible inference that Powell was indeed listed on more claims than he was actually involved with. Drawing all inferences in Taylor's favor at this stage, as the Court must, the Court holds that the 2AC's presentment allegations relating to credentialing are sufficient.

***2. Claims for "Incident to" Services.*** – Medicare reimburses some "services and supplies incident to the service of a physician (or other practitioner)." 42 C.F.R.

§ 410.26(b) (outlining nine reimbursement criteria).  To begin with, there must be "a direct, personal, professional service furnished by the physician to initiate the course of treatment," as well as "subsequent services by the physician of a frequency that reflects the physician's continuing active participation in and management of" the patient's care. Medicare Benefit Policy Manual ch.15 § 60.2.  Further, "incident to" services by nonphysicians must be "furnished under … direct supervision," excluding two exceptions not invoked by Defendants here.  42 C.F.R. § 410.26(b)(5).  Supervising practitioners need not "be present in the room when the procedure is performed," but in an office setting, they "must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure."  *Id.* § 410.32(b)(3)(ii).  The supervisor may be one other than the practitioner "treating the patient more broadly," but "only the supervising physician (or other practitioner) may bill Medicare for incident to services."  *Id.* § 410.26(b)(5).

According to Taylor, HCAT had a policy of improperly "split-billing" patient visits and associated ancillary procedures.  2AC ¶ 5.  Both physicians and nonphysicians handled the beneficiary office visits.  *Id.* at ¶ 127.  But Taylor says that HCAT regularly submitted claims for ancillary services under the national provider identifiers ("NPIs") of its Founding Physicians, "regardless of whether [they] had directly supervised the service," initiated the course of treatment, or continued active participation in managing the treatment.  *Id.*  Under Medicare regulations, HCAT could recover greater reimbursement rates by billing to physicians than to nonphysician practitioners.  *See, e.g.*, 42 C.F.R. §§ 414.52 (physician assistants' services reimbursable at a rate of between 65

and 85 percent of the physician rate), 414.56 (nurse practitioners' and clinical nurse specialists' services reimbursable at no more than an 85 percent rate).  And split-billing in this manner would facilitate billing for services performed by practitioners not yet enrolled or reassigned as previously discussed.

The 2AC contains sufficient factual content to state a plausible claim based on the split-billing policy.  To comply with the "incident to" billing regulations, the services must be in conjunction with the treatment of a physician or other practitioner, and organizational providers cannot manufacture reimbursable "incident to" status by post hoc assignment of unrelated physicians' NPIs.  *See, e.g.*, *United States v. Bonham*, 1999 WL 511349, at *4 (5th Cir. 1999) (unpub) (affirming liability for defendant who filed claims under his provider number with CPT codes that "affirmatively misrepresented that he personally provided" care because he "was not lawfully entitled to be reimbursed" for "medical services … rendered by [his] nurses and therapists-employees").  In contrast, the 2AC describes billing to the Founding Physicians' NPIs even when they had nothing to with the services.  2AC ¶ 127.

Perhaps Defendants are correct that the designated physicians were present and available for permissible supervision on each date of service.  But that explanation is not more obvious than Taylor's, and merely possible legal explanations do not overcome the Court's obligation to draw all inferences in Taylor's favor at this stage.  *Cf. Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (explaining that in *Twombly*, actions consistent with lawful conduct could not support a claim because the plaintiff

offered only a "conclusory allegation on information and belief" that the challenged conduct was unlawful)).

Moreover, the 2AC casts doubt on Defendants' supervision theory. Taylor alleges that HCAT sought to bill services to the Founding Physicians from a location where none of them practiced. ¶ 158. HCAT personnel even allegedly acknowledged that "HCAT was splitting claims and changing the billing provider to a founder" because "the founder would hit the higher tier 1 fee schedule, thus increasing revenue," *id.* ¶ 156, and that midlevel practitioners were "treating new patients without the appropriate physician supervision." *Id.* ¶ 157. And as discussed previously, it would be virtually impossible for Powell to have complied with the incident-to billing requirements while submitting 13,471 claims for lab tests in conjunction with only 88 office visits, averaging almost 37 services daily before even taking privately insured patients into account. *Id.* ¶¶ 5, 138. Further, the unequal distribution of the types of services billed to each Founding Physician is suspect given that they are all generalized family practitioners. *Id.* ¶ 141–54.

Because Taylor supported her allegations with details about how the split-billing policy resulted in claims for nonreimbursable services, as contemplated in *Grubbs*, 565 F.3d at 190–91, her claim is adequately stated.

***3. Claims for Unnecessary Tests.*** – Medicare limits coverage to services that are "medically required." 42 U.S.C. § 1395n(a)(2)(B). Accordingly, Medicare Part B does not reimburse annual physical examinations for beneficiaries. 42 C.F.R. § 411.15(a). Instead, the program allows one Initial Preventative Physical Examination ("IPPE") to review the patient's medical history and discuss preventative services. *Id.* § 410.16(b).

An IPPE must be performed by a physician or a qualified nonphysician practitioner, which includes a physician assistant, nurse practitioner, or clinical nurse specialist. *Id.* § 410.16(a). The IPPE is followed by Annual Wellness Visits ("AWVs"), where the provider assesses the patient's health risks, family history, cognitive function, and mental health, creates a follow-up plan, and provides personalized health advice and referrals. *Id.* § 410.15(b). The same professionals permitted to perform IPPEs may perform AWVs, and additionally so may "other licensed practitioner[s]" such as "a health educator, a registered dietitian, or nutrition professional" when working under a physician's direct supervision. *Id.* § 410.15(a). Patients also may initiate visits to address specific concerns. *See id.* § 410.20(a) ("Medicare Part B pays for physicians' services, including diagnosis, therapy, surgery, consultations, and home, office, and institutional calls.").

Similarly, Medicare does not cover preventive laboratory diagnostic testing. *See* 42 C.F.R. § 411.15(k). Those services must be "reasonable and necessary," meaning that outside of certain preventative screenings, they must be ordered by the treating physician or permitted nonphysician practitioners "for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." *Id.* § 411.15(k)(1); § 410.32(a). Tests ordered by unauthorized professionals or practitioners who are not treating the patient are not reasonable and necessary. *Id.* § 410.32(a).

Taylor alleges that HCAT skirted these regulations in numerous ways through its Pre-Examination Preparation ("PEP") Department. According to Taylor, HCAT scheduled patients to visit the PEP department before an annual exam. 2AC ¶ 176.

MEMORANDUM OPINION AND ORDER – PAGE 14

There, medical assistants conducted the components of the AWV without direct physician supervision, including determining which ancillary procedures should be ordered such as dilated eye exams, urinalysis, and blood tests "from an established slate of PEP tests." *Id.* ¶¶ 177–78, 81. Allegedly, the "HCAT clinical manual instructed that even if the patient said he or she was 'feeling well, with no complaints,'" medical assistants should "sweep the patient's chart for 'past problem[s],'" order labs, and "assign diagnosis codes to those tests." *Id.* ¶ 185. Taylor contends that HCAT even blocked physicians from making adjustments to the medical assistants' selections because it would be "outside of the protocols." *Id.* ¶ 188. Instead of completing the AWV in a single visit, HCAT then instructed patients to return, *id.* ¶ 189, and billed the second visit as a "patient-initiated problem-oriented office visit covered by Medicare Part B." *Id.* ¶ 190.

Combined with manipulation of charting dates and documenters, *id.* ¶¶ 195–202, 212, this approach "ma[d]e it appear to Medicare reviewers that a provider had performed the AWV, received a patient complaint during the AWV, consequently ordered the laboratory test, and then confirmed the suspicion and offered further services during the second visit." *Id.* ¶ 206. Further, HCAT allegedly did not bill for tests that came back normal, which Taylor says suggests strategic billing. *Id.* ¶ 210. She claims that the PEP Department scheme enabled improper reimbursement in several ways:

1. IPPEs and AWVs performed by medical assistants without direct physician supervision are not reimbursable. *Id.* ¶ 207.

2. Diagnostic labs selected and ordered by medical assistants are not reimbursable. *Id.* ¶¶ 208, 213.

MEMORANDUM OPINION AND ORDER – PAGE 15

3. The subsequent "patient-initiated office visits" were actually directed by HCAT and lacked a true chief complaint by the patient, allowing HCAT to bill for two visits when only one was warranted. *Id.* ¶¶ 209, 211.

4. If a patient wanted a physical but had already had an AWV within the past year, HCAT instructed the PEP Department to nevertheless schedule them and chart the visit as a "follow up of chronic conditions," even if medical assistants "could not find any chronic conditions in the patient's chart." ¶¶ 183, 200.

HCAT employees confirmed to Taylor that claims were being submitted according to these policies. *Id.* ¶¶ 215–17. Defendants' explanations that medical assistants merely charted orders by providers, who had leeway to add or drop tests as they wished, misstate Taylor's allegations. Defendants also argue that lab tests "based on treatment protocols" are reimbursable, but their authority for that premise explains that "services ordered and rendered, including those based on treatment protocols, are considered for reimbursement" only "when documentation supports the orders and/or protocols are individualized to each patient." *See* CMS Medicare Learning Network, Complying with Laboratory Services Documentation Requirements, MLN 909221 (Dec. 2020). Defendants have not explained how the Medicare regulations authorize HCAT medical assistants to make such determinations. The 2AC plausibly states an FCA claim based on HCAT's PEP Department operations.

### *B. Particularity*

Second, Defendants argue that the 2AC fails Rule 9(b)'s particularity requirement because Taylor has not alleged exemplar fraudulent bills, including concrete services, dates, and patients involved. But in this Circuit, relators are not required to allege

specific details about a false claim that was actually submitted.  *Grubbs*, 565 F.3d at 190. The Fifth Circuit has acknowledged that in many cases, such records will be in the defendants' possession.  *Id.* at 191.  Further, plaintiffs do not even need "exact dollar amounts, billing numbers, or dates" to prevail at trial; "[t]o require these details at pleading" would virtually "requir[e] production of actual documentation with the complaint," which is "significantly more than any federal pleading rule contemplates." *Id.* at 190.

Accordingly, relators can also satisfy Rule 9(b) "by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.*  Rule 9(b)'s purpose is to guard against "fishing expeditions," and "a complaint that includes … particular details … limits any 'fishing' to a small pond that is either stocked or dead." *Id.* at 191.  Sufficient details include, but are not limited to, "dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into."  *Id.* at 191. Other district courts have considered the "time, place, contents, and identity" standard for fraud claims to be met where the complaint "allege[d] a general scheme to defraud the government, when the scheme occurred, those involved, its mechanics, an explanation of how the claims were false, and a description of the billing system." *Wagemann v. Doctor's Hosp. of Slidell, LLC*, 2010 WL 3168087, at *4–5 (E.D. La. 2010) (citing *Grubbs*, 565 F.3d at 190–91).

Taylor has provided numerous examples and hypotheticals to illustrate the mechanics of HCAT's billing policies, explained how the policy applications violated the

law, and cited conversations with HCAT billing staff about how such claims had been and continued to be submitted.  The 2AC specifies HCAT locations that employed these practices, practitioners listed on the allegedly fraudulent bills, codes used on the bills, services and tests billed for, individuals involved with and knowledgeable of the fraud, date ranges, corroborating claims data and HCAT internal documents.  *See, e.g.*, 2AC ¶¶ 105–07, 129–54, 177–82, 189–94, 215–218.  Courts have found, based on less detailed allegations, reliable indicia leading to a strong inference that defendants submitted false claims.  *See, e.g.*, *United States v. Planned Parenthood Fed. of Am., Inc.*, 601 F. Supp. 3d 97, 115–116 (N.D. Tex. 2022) (crediting "a strong inference that Defendants submitted false claims for reimbursement" from the allegation that Defendants continued to submit reimbursement claims after they were terminated from two state Medicaid programs); *cf. U.S. ex rel. Doe v. Lincare Holdings, Inc.*, 2017 WL 752288, at *6 (S.D. Miss. 2017) (holding that complaint fell short of the *Grubbs* standard where, among other reasons, the relator was a "sales representative" who did not identify any "information about the company's billing system," "facts to suggest that he ha[d] knowledge of how [defendant submitted] bills for payment," or "any billing personnel who had submitted false claims as a result").  Defendants have not shown that the 2AC is insufficiently particular to provide notice of the claims against them.  *See Grubbs*, 565 F.3d at 191.

## *C. Materiality*

Finally, Defendants argue that the 2AC fails to show that the alleged false statements were material to reimbursement.  A false statement is material if it has a "natural tendency" or "potential" to influence the government's payment decision,

regardless of whether it actually did so.  *Longhi*, 575 F.3d at 469.  "The materiality standard is demanding," and it is not enough "that the Government would have the option to decline to pay if it knew of the defendant's noncompliance."  *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 194 (2016).  Following *Escobar*, the Fifth Circuit evaluates (1) whether the Government has expressly identified a provision as a condition of payment, (2) the defendant's knowledge that the Government consistently refuses to pay claims based on noncompliance with a given provision, and (3) whether the noncompliance is minor or insubstantial.  *U.S. ex rel. Lemon v. Nurses to Go, Inc.*, 924 F.3d 155, 160 (5th Cir. 2019) (citing 579 U.S. at 194).  That said, though, the Fifth Circuit has acknowledged that it would not be realistic to "expect Relators to know precisely the Government's prosecutorial practices without the benefit of discovery." *Lemon*, 924 F.3d at 162 (discussing *U.S. ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822 (6th Cir. 2018)).  "No one factor is dispositive, and [the] inquiry is holistic."  *Lemon*, 924 F.3d at 160.

Defendants have not carried their burden to explain how Taylor's allegations fail the materiality requirement.  *See United States v. Marlin Med. Solutions LLC*, 579 F. Supp. 3d 876, 890 (W.D. Tex. 2022).  The 2AC does more than simply allege that the government would not have paid the claims if it had known the truth.  *See* 2AC ¶ 228; *but see Marlin Med. Solutions*, 579 F. Supp. 3d at 890 (giving weight to the complaint's allegation that the government program "was unaware of the falsity of the claims and thus paid for claims 'that would otherwise not have been allowed'").  It also explains how the errors at issue affected conditions of payment.  The Medicare regulations set out a

specific scheme for the reimbursability and rates of various services, including incident-to services, AWVs, and lab tests, depending on provider identity, supervision, and credentialing.  Courts have consistently recognized that "billing errors" on those criteria can be material.  *See, e.g.*, *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378–79 (5th Cir. 2004) (allowing an FCA claim to proceed where defendant billed for services rendered by an unlicensed physician and concealed it in the claims);  *U.S. ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 2022 WL 80293, at *4 (W.D. Tex. 2022) ("[T]he Court finds that a reasonable trier of fact could find that [submitting] claims under the wrong physician's name … could have influenced the Government's pay decision or had the potential to."); *United States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001) ("However, a claim may be false even if the services billed were actually provided, if the purported provider did not actually render or supervise the service.").  Further, it asserts that the impact of the fraud is "millions of dollars in reimbursements from taxpayer money."  *See* 2AC ¶ 4.

The *Escobar* factors favor Taylor.  First, Defendants have not countered Taylor's allegations of conditions of payment by offering any reason to think that reimbursement would be the same regardless of the government's knowledge that services were actually rendered: by practitioners with 15% lower reimbursement rates and without appropriate supervision;  by not-yet-enrolled-or-reassigned practitioners;  by unlicensed medical assistants without appropriate supervision;  without medical necessity;  or some combination of those things.  On the second factor, *U.S. ex rel. Gray v. Mitias Orthopaedics, PLLC* is instructive.  512 F. Supp. 3d 689 (N.D. Miss. 2021).  In *Gray*, the

MEMORANDUM OPINION AND ORDER – PAGE 20

district court allowed an FCA case to go forward where a physician's practice submitted claims for a non-FDA-approved and nonreimbursable substance by representing it as a different, approved substance, under a qualified provider when injections were performed by nonqualified technicians.  *Id.* at 690.  The court reasoned that the complaint alleged materiality because the defendants' actions "raise[d] questions whether [they] knew that Medicare would not actually support [their] billing practices," and a jury could find their arguments "disingenuous," "convenient," and "self-serving."  *Id.* at 696–98.  Here, too, Taylor alleges that HCAT routinely substituted billing codes and practitioners in ways that served its objectives of hastening and maximizing reimbursements, and the same conclusion could be drawn.  And Defendants do not suggest that noncompliance with such an impact would be "minor or insubstantial."  Defendants have not demonstrated a failure by the 2AC to show materiality.

## CONCLUSION

Defendants have not explained why the challenged portions of the 2AC are impermissible with the necessary specificity.  Further, the disputed allegations are sufficiently plausible and particularized, and Defendants have not carried their burden to explain why the misrepresentations alleged are not material.  The Court accordingly denies the motions to strike and to dismiss.

Signed May 5, 2023.

David C. Godbey
Chief United States District Judge

MEMORANDUM OPINION AND ORDER – PAGE 21