IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *ex rel.* CHERYL TAYLOR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:19-CV-02486-N |
| | § | |
| HEALTHCARE ASSOCIATES OF | § | |
| TEXAS, LLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses eight motions to exclude expert testimony filed by the Defendants (collectively, "HCAT").  HCAT moves to exclude the expert testimony of Mark Anderson [408]; Dr. John Charalambopoulos [409]; Dr. Sunil Lalla [410]; Juliette Morell [411]; Melissa Scott, Nicholas Ross, and Joseph Krock [412]; and Joshua Dennis [413].  HCAT also moves to exclude expert testimony on the subjects of credentialling [414] and corporate conduct [415].  Because the Court finds that Relator Cheryl Taylor has shown that each of these experts meets the requirements of Rule 702, the Court denies these motions.

### I. ORIGINS OF THE DISPUTE

This case arises from claims under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), against Defendants Healthcare Associates of Texas, LLC, Healthcare Associates of Irving, LLP, David Harbour, Jeff Vines, Kristian Daniels, Dr. Charles L. Powell, Dr. David Deems, Dr. Walter Gaman, and Dr. Terrence Feehery.  Taylor alleges that she

MEMORANDUM OPINION AND ORDER – PAGE 1

observed HCAT and its agents, the individual defendants, employ fraudulent Medicare billing practices.  The Court has discussed Taylor's factual allegations at some length, *see, e.g.*, *United States ex rel. Taylor v. Healthcare Assocs. of Tex., LLC*, 2023 WL 3294141, at \*1 (N.D. Tex. 2023), and the Court will not recount them in great depth here.  Defendants now move to exclude the testimony of eight of Taylor's expert witnesses.

## II. LEGAL STANDARD FOR EXPERT TESTIMONY

Under Federal Rule of Evidence 702 a witness must be qualified as an expert by "knowledge, skill, experience, training, or education."  FED. R. EVID. 702.  A qualified expert may testify if the expert's specialized knowledge will help the trier of fact and (1) "the testimony is based upon sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  *Id*.  District courts must determine that expert testimony "is not only relevant, but reliable," and make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid" and "can be applied to the facts in issue."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 592–93 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51 (1999) (holding *Daubert* principles apply to all types of experts).  The focus, however, "must be solely on principles and methodology, not on the conclusions that they generate."  *Daubert*, 509 U.S. at 595.

District courts have broad discretion to determine the admissibility of expert testimony.  *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016).  But the rejection of expert testimony is the exception, not the rule.  *In re DePuy Orthopaedics, Inc.*

*Pinnacle Hip Implant Prods. Liab. Litig.*, 2016 WL 9560113, at *3 (N.D. Tex. 2016).  The *Daubert* inquiry may not replace the adversarial system.  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002).  "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 250 (quoting *Daubert*, 509 U.S. at 596).  Indeed, "while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id.*

### III.   THE COURT DENIES THE MOTION TO EXCLUDE ANDERSON'S TESTIMONY

Taylor retained Mark Anderson to testify regarding the utility and significance of electronic health record ("EHR") systems within the healthcare field and specific features and configurations of HCAT's EHR systems.   Anderson Report at Rel.'s Appx. 3.[1] Specifically, his opinions include discussions of progress notes, audit logs, time stamps, and co-signing and bulk signing features for the EHR systems that HCAT used — Allscripts and eCW.  *Id.*  HCAT does not contest that Anderson is qualified to testify on these subjects.  But HCAT takes aim at multiple portions of his expert report, arguing that various opinions are unreliable, irrelevant, based on insufficient evidence, or are improper fact testimony.  Because the Court finds that Anderson's opinions satisfy the requirements of Rule 702, the Court denies HCAT's motion to exclude Anderson's testimony.

---

[1] Relator's appendix spans nine docket entries, ECF Nos. 436–44.  Page numbers cited in Relator's Appendix correspond to the J. APP. number on each appendix page.

MEMORANDUM OPINION AND ORDER – PAGE 3

### A.    Anderson's Definitions of Key Terms are Reliable and Relevant

First, HCAT argues that Anderson's definitions and explanations of key terms are unreliable and irrelevant.  Def.'s Mot. Exclude Anderson 6 [408].  It takes issue with the basis for Anderson's definitions, arguing that they come from nothing other than his own say-so.  *Id.* at 6–7.  It also argues that his definitions are not relevant because he "fails to reference a single piece of evidence."  *Id.* at 7.  Taylor counters that experts may define and explain the terms they will use, and that Anderson used these terms to develop the context of the claims in this case.  Rel.'s Resp. Anderson 13–16 [445].  Reviewing Anderson's report, the Court concludes that his definitions and explanations are reliable and relevant.

Anderson's definitions and explanations come from more than just his say-so.  Generally, experts are permitted to define jargon and technical terms.  *See United States v. Haines*, 803 F.3d 713, 728–29 (5th Cir. 2015) (permitting expert testimony on drug trade jargon); *United States v. Okoroji*, 2018 WL 8756433, at *1 (N.D. Tex. 2018) (finding that testimony about Medicare definitions and requirements falls within the province of an expert).  If experts could not define terms, very little expert testimony would end up being helpful to the jury.  Here, Anderson dedicates thirty-two paragraphs of his report to defining and explaining terms and general features of EHR software.  Anderson Report at Rel.'s Appx. 9–24.  This section of his report precedes his opinions about HCAT's specific software configurations.  *Id.* at 24.

Here, these definitions outline some specific pieces of specialized knowledge that Anderson used in arriving at his opinions.  Anderson has over fifty years of experience in

MEMORANDUM OPINION AND ORDER – PAGE 4

healthcare and information technology.  Anderson Report at Rel.'s Appx. 4.  He has fifteen years of experience as the CIO of a hospital.  *Id.* at 7.  He is not required to point to a technical dictionary for every term he intends to use when formulating his opinions.  He may explain his specialized knowledge in a form that is consumable to the jury by way of defining the jargon he uses.  And he may utilize his experience in the healthcare field to do so.  To the extent HCAT believes Anderson's definitions are incorrect, it may cross-examine him and present its own experts to discuss the technology at issue.  Accordingly, Anderson's definitions are reliable.

Further, his definitions are relevant to matters in the case.  A core allegation at issue in the case is whether HCAT billed Medicare for services that unqualified medical assistants performed.  Second Am. Compl. ¶¶ 181–188 [89].  Taylor also alleges that HCAT manipulated its EHR records to cover this up.  *Id.* ¶¶ 195–206.  Understandably, EHR records that include information about which providers have interacted with a patient's file are key pieces of evidence to support or refute this allegation.  Explanation of what EHR systems are, how they work, and the jargon associated with the systems are relevant to the issues in the case and are helpful to the jury.  Accordingly, Anderson is permitted to testify regarding specialized terms used in developing his opinions.

### B.    *Anderson's Opinions on Timestamps are Proper*

Second, HCAT argues that Anderson's opinions on the Allscripts timestamp feature are fact testimony and not proper expert opinion, are unreliable, and are based on insufficient evidence.  Defs.' Mot. Exclude Anderson 8–12.  Because experts may describe the factual basis for their opinions, the Court finds that Anderson's testimony on this topic

is proper.  The Court also finds that his opinions on this topic are reliable and based on sufficient evidence.

Experts may look at the facts of a case and apply their expertise, skill, and knowledge to form an opinion.  Where courts draw the line is when an expert seeks to "summarize" the other, nonexpert evidence present in a case.  *Robroy Indus.–Tex., LLC v. Thomas & Betts Corp.*, 2017 WL 1319553, at *9–10 (E.D. Tex. 2017) (collecting cases); *see also Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (noting that experts cannot act as "the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion" (quoting *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005))).

Anderson's opinions do not impermissibly summarize facts in this way.  Anderson opines on the specifics of how Allscripts records the username of the provider that entered information into a health record.  Anderson Report at Rel.'s Appx. 24–25.  He first discusses how the system works generally: "When you log in to Allscripts, your username is stamped on the tables of records and transactions you enter." *Id.* at 24.  Then, he reviews an email chain where two people within HCAT disagree about how the system works. *Id.* at 25.  Finally, he opines on how, based on his experience with Allscripts, the system actually functions. *Id.*  In essence, he weighs in on the apparent disagreement within HCAT on what the system does.  His opinion, while referencing this confusion within HCAT, is not testimony on who entered what information into which patient records at HCAT. Instead, it is opinion testimony on how, in Anderson's experience, the Allscripts software works.  It is not a regurgitation of otherwise admissible evidence but is an attempt by

MEMORANDUM OPINION AND ORDER – PAGE 6

Anderson to clarify what may end up being a dispute at trial about the technical functionality of a piece of software. Accordingly, it is acceptable expert opinion, and not improper fact testimony.

HCAT also argues that Anderson's timestamp opinion is based on only one email, and therefore based on insufficient evidence and is unreliable. Defs.' Mot. Exclude Anderson 11. Anderson does reference an internal HCAT email in his opinions. Anderson Report at Rel.'s Appx. 25. However, that email is clearly not the only basis for his opinion. Anderson has decades of experience with EHR and other healthcare information management systems. *Id.* at 7. His opinion is based on this experience. He references the email because he weighs in on an internal disagreement at HCAT about how the system functions. Accordingly, his timestamp opinion is based on sufficient evidence and is reliable.

### C.   *Anderson's Opinions on Bulk Signing, File Headers and Labs are Proper*

Next, HCAT argues that Anderson's opinions on bulk signing, file headers, and labs should be excluded. The Court takes each of these arguments in turn.

On bulk signing, HCAT argues that these opinions are improper fact testimony. Defs.' Mot. Exclude Anderson 14. The Court disagrees. Anderson stated that Allscripts and eCW have the ability to be configured with bulk signing capability. *Id.* at 25–26. He then reviewed multiple HCAT documents to see how HCAT configured their systems. *Id.* at 26. Finally, he opined that the way that HCAT configured and used its bulk signing and co-signing functions did not align with his experience in how these functions should be used in medical practices. *Id.* While he does make some factual statements about how

MEMORANDUM OPINION AND ORDER – PAGE 7

HCAT's EHR systems worked, his statements are permissible.  It would not be possible for Anderson to opine that HCAT's bulk signing protocols were inconsistent with his EHR experience without stating how HCAT used its EHR system.  His opinions on how HCAT utilized its EHR systems are a far cry from simple regurgitation of other evidence. Instead, they are based on his analysis of documents, and required Anderson to use his experience to interpret them.  Thus, this is proper expert opinion.

HCAT also argues that Anderson's bulk signing opinions are based on insufficient evidence and are unreliable.  Defs.' Mot. Exclude Anderson 13–19.  It takes issue with the fact that Anderson did not inspect HCAT's software himself and instead relied on "fewer than 20 emails" to determine how HCAT configured its software. *Id.* at 15–16.  However, Anderson testified that even if he could access HCAT's systems today, that would not give him any additional information as to how HCAT configured its systems in the relevant time period for this dispute.  Rel.'s Appx. 4771.  His reliance on internal HCAT emails and documents allowed him to examine the ways that HCAT used their EHR systems and provided the factual basis for his opinions about bulk signing.  His analysis of the documents combined with his years of experience in the EHR field allowed him to generate these opinions.  Thus, they are based on sufficient evidence and are reliable.

On file headers, HCAT argues that Anderson's opinions are again just summaries of fact evidence.  Defs.' Mot. Exclude Anderson 21.  But the meaning of file headers within a specific piece of software is a form of specialized technical knowledge.  While his opinions might align with HCAT's understanding of the software, he is not regurgitating existing evidence.  Instead, his opinions come from his experience with this software, and

MEMORANDUM OPINION AND ORDER – PAGE 8

will help the factfinder to interpret the EHR data presented at trial.  Accordingly, his opinions on file headers are permissible.

On labs, HCAT argues Anderson's opinions are unreliable and based on speculation.  *Id.* at 19–21.  The Court disagrees.  In a similar process as he used in his other opinions, Anderson discussed how EHR systems function with respect to handling labs, and then analyzed multiple documents and emails from HCAT to determine how its system was configured.  Anderson Report at Rel.'s Appx. 28–30.  He then concludes that, based on his analysis and experience with EHR systems, it is technologically possible that HCAT could have been sending labs to the wrong provider.  *Id.*  This procedure draws from his experience in the field and is an appropriate method for him to reach the conclusion that he did.  Accordingly, this opinion is permissible.

Because Taylor has shown that Anderson's opinions meet the requirements of Rule 702, the Court denies HCAT's motion to exclude his testimony.

## IV.    THE COURT DENIES the MOTION to EXCLUDE DR. CHARALAMBOPOULOS'S TESTIMONY

Taylor retained Dr. Charalambopoulos to testify about HCAT's medical practices and whether they are consistent with his understandings of the standard of care and with Medicare requirements.  Charalambopoulos Report at Rel.'s Appx. 98.  HCAT moves to exclude his testimony for a variety of reasons, including that he is not qualified, and that his opinions are unreliable, irrelevant, based on insufficient evidence, and overly prejudicial.  Defs.' Mot. Exclude Charalambopoulos 1–3 [409].  Because the Court finds

that his testimony meets the requirements of Rule 702 and Rule 403, the Court denies the motion.

### A.    Dr. Charalambopoulos's Opinions on Evidence-Based Medicine and a Culture of Over-Testing are Proper

First, HCAT argues that Dr. Charalambopoulos's opinions about evidence-based medicine ("EBM") and a "culture of over-testing" should be excluded as irrelevant, based on speculation, and overly prejudicial.  Defs.' Mot. Exclude Charalambopoulos 5–11. Because the Court finds that these opinions are relevant, probative of the issue of knowledge, and based on sufficient evidence and experience, the Court concludes that these opinions are proper.

Dr. Charalambopoulos opines that HCAT violated EBM principles in a number of ways, including by expecting medical assistants to make clinical decisions without sufficient oversight of a physician.  Charalambopoulos Report at Rel.'s Appx. 106.  He also evaluated how HCAT ordered tests for patients through the Physical Exam Preparation ("PEP") department and concluded that HCAT ordered more tests than were medically necessary.  *Id.* at 112–20.  From this, he concludes that HCAT's practices "fostered a culture of over-testing."  *Id.* at 120.  HCAT attacks these opinions on the grounds that they are irrelevant (because EBM is not the standard for whether Medicare will pay a claim) and overly prejudicial.

Considering these opinions and the operative complaint, the Court finds that these opinions are relevant.  The complaint alleges that HCAT billed Medicare for services that were performed by an unqualified medical assistant instead of a qualified provider.  Second

Am. Compl. ¶¶171–94.  One element of a False Claims Act claim is knowledge by the defendant that the claim they submitted was false or fraudulent.  *See* 31 U.S.C. § 3729(a)(1); *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 466–68 (5th Cir. 2009).  And the bar for relevance is low — Taylor only needs to show that the proffered testimony relates to an issue in the case and is sufficiently tied to the facts to be helpful.  *See Daubert*, 509 U.S. at 591.  Here, Dr. Charalambopoulos opines that EBM standards expect a physician, not a medical assistant, to make clinical decisions on behalf of a patient.  Charalambopoulos Report at Rel.'s Appx. 105–07.  If HCAT is knowingly straying from EBM practices in this area, then it is more likely that HCAT knew that the claims it submitted to Medicare were false.  Thus, these opinions are relevant.

Further, they are not overly prejudicial under Rule 403.  The standard for exclusion under Rule 403 is that the probative value of the evidence be substantially outweighed by the risk of unfair prejudice, confusion, delay, or cumulative evidence.  FED. R. EVID. 403. Here, this information is probative of HCAT's knowledge.  It helps establish whether HCAT providers engaged in a common scheme or plan to submit claims that were performed by unqualified medical assistants.  Certainly, this evidence is harmful to HCAT's case.  But that does not make the evidence unfairly prejudicial to the point that this prejudice significantly outweighs the probative value.  Thus, it should not be excluded under Rule 403.

### B.     Dr. Charalambopoulos's Opinions are Based on Sufficient Data

Second, HCAT argues that Dr. Charalambopoulos's opinions are not based on sufficient data.  Defs.' Mot. Exclude Charalambopoulos 11.  Specifically, it claims that he

did not review any patient's complete medical records before opining that treatment or testing was "somehow improper." *Id.* at 12. HCAT also takes issue with his reliance on progress notes, arguing that these are an unreliable data source. *Id.* at 13–15. Reviewing his report and the record, the Court concludes that his opinions are based on sufficient data to meet the requirements of Rule 702.

Dr. Charalambopoulos opines, among other things, that "HCAT instructed medical assistants to order medically unnecessary over-testing." Charalambopoulos Report at Rel.'s Appx. 112. In reaching this conclusion, Dr. Charalambopoulos primarily analyzed internal HCAT policy and procedure documents that specified how the PEP department should order tests. As an example, he found that the PEP department was instructed to order bone density scans for women over 50 every two years. *Id.* at 113. He then discussed the medical literature on bone density scans and opined that this rate of testing was excessive. *Id.* at 114. In concluding that it was HCAT policy to order more tests than medically necessary, there was no need for Dr. Charalambopoulos to review any single patient's full medical record. His opinion concerns not just whether a specific instance of testing was necessary, but whether HCAT's practices and procedures resulted in unnecessary testing. It would be expected for other practitioners in the medical field to review policy documents when determining whether an organization had a policy of ordering too many tests. Accordingly, his opinions are based on sufficient evidence.

Dr. Charalambopoulos is also entitled to rely on progress notes in forming his opinions. He relied on progress notes as part of his factual background looking at the PEP department's practices of having "providers sign[] for annual wellness visits performed

by PEP medical assistants even though the provider had not seen the patient." *Id.* at 103; Rel.'s Appx. 4800.  HCAT argues that he cannot determine from progress notes alone who rendered the service.  Defs.' Mot. Exclude Charalambopoulos 14.  However, Dr. Charalambopoulos considers that relying on progress notes is a "well-guarded practice" in the medical field — that is, that this is the kind of information other practitioners would rely on in making this kind of determination.  *See* Rel.'s Appx. 4800.  Additionally, Taylor's expert Mark Anderson does opine on how to interpret Allscripts progress notes and timestamps.  HCAT contests whether the timestamps were accurately reporting who the provider was.  Defs.' Mot. Exclude Charalambopoulos 15.  But this dispute over the technology goes to weight of the evidence here, not admissibility.  Because progress notes are an appropriate form of evidence for an expert in this field to rely upon, Dr. Charalambopoulos's opinions here are based on sufficient evidence.

### C.  Dr. Charalambopoulos is Qualified to Give His Opinions and Does Not Render Legal Conclusions

Next, HCAT argues that Dr. Charalambopoulos makes impermissible legal conclusions and that he is not qualified to give such opinions.  *Id.* at 18–19.  However, the Court concludes that Dr. Charalambopoulos does not make legal conclusions and is qualified to give the opinions in his expert report.

An expert can be qualified on a subject by knowledge, skill, experience, training, or education.  FED. R. EVID. 702.  The Fifth Circuit recognizes work experience as a basis for expert qualification.  *See United States v. Brown*, 871 F.3d 352, 357 (5th Cir. 2017) (affirming qualification of Medicare billing expert based on work experience).  Here, Dr.

Charalambopoulos (1) is a medical doctor, (2) is the vice-chief primary care physician of a hospital, (3) is the medical director of a long-term care facility, (4) sat on a peer review committee that investigated physician wrongdoing, and (5) trained on the standards of care including HHS/CMS standards.  This training, education, and experience qualifies him to testify on subjects including medical standards of care, the functions of different medical professionals, appropriate practices within a healthcare facility, and whether specific practices are consistent with his experience working with Medicare. [2]

Additionally, Dr. Charalambopoulos is permitted to cite to regulations as supporting his opinions about acceptable medical practices.  Generally, expert witnesses cannot render legal conclusions.  *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996).  However, an expert is permitted "explain a complicated area of the law and the facts related to it" as long as he does not "conclude that a defendant violated the law."  *United States v. Okoroji*, 2018 WL 8756434, at *1 (N.D. Tex. 2018).  In this way, an expert can say, for example, that "Medicare, according to its billing process, will not reimburse for claims that violate . . . Medicare regulations."  *Id.* at *2.  Similarly, an expert could opine as to whether he believes certain practices and procedures are consistent with Medicare's guidelines, so long as the expert does not dispositively state what the law is and whether any action was "illegal."  *United States v. Crinel*, 2016 WL 6441249, at *9 (E.D. La. 2016).

---

[2] Relator withdrew Dr. Charalambopoulos's opinion number nine, regarding sudomotor function tests.  Rel.'s Resp. Charalambopoulos 12 [446].  Because this opinion is withdrawn, the Court does not rule on whether Dr. Charalambopoulos is qualified to testify on sudomotor function tests.

MEMORANDUM OPINION AND ORDER – PAGE 14

Here, Dr. Charalambopoulos gives multiple opinions that touch on legal concepts. However, they are a far cry from a conclusive statement that HCAT broke the law. Each of his opinions is based on his experience in the medical field, and reflects what, in his view, is the standard of care or is the usual practice for a medical provider. In making these opinions, he is permitted to cite to Medicare rules or guidelines, or Texas law, to lend support to his conclusion that something is or is not an appropriate practice.

For example, HCAT objects to Dr. Charalambopoulos's opinion on "the difference between medical assistants and physician's assistants" because it relies on the Texas Administrative Code. Defs.' Mot. Exclude Charalambopoulos 18. However, his opinion on this subject reads as if it stems from his experience in the medical field, not a direct interpretation of Texas law. Indeed, he describes at length the types of work and different responsibilities of these two medical roles, and appends a cite to the Texas Administrative Code at the end for the proposition that physician's assistants "in most states, including Texas, can examine, diagnose, and treat patients." Charalambopoulos Report at Rel.'s Appx. 106. This is not a statement that HCAT broke the law. The other opinions that HCAT objects to on this ground follow a similar pattern. *See* Defs.' Mot Exclude Charalambopoulos 18–19. Thus, his opinions are not improper legal conclusions. If any party does seek to offer legal conclusion testimony at trial, it can be addressed by a timely objection.

### D.  Dr. Charalambopoulos's Opinions on Standing Orders and Bulk Signing are Proper

Finally, HCAT argues that Dr. Charalambopoulos's opinions on standing orders, batch signing, and incident-to billing should be excluded because his conclusions are contradicted by the applicable law.  Defs.' Mot. Exclude Charalambopoulos 21–25. However, the Rule 702 inquiry is not based on the expert's conclusions, but on his methods. And here, his opinions come from his experience as a physician and his review of HCAT patient notes.  His methods were sufficient for Rule 702.  To the extent HCAT believes his conclusions are incorrect, it can bring contradictory evidence and make its own legal arguments at trial.

Having reviewed Dr. Charalambopoulos's opinions, the Court concludes they meet the requirements of Rule 702.  Accordingly, HCAT's motion to exclude his opinions is denied.

### V.    THE COURT DENIES THE MOTION TO EXCLUDE DR. LALLA'S TESTIMONY

Taylor retained Dr. Lalla to review medical records and billing practices from HCAT and offer opinions on whether Medicare, through its Medicare Administrative Contractor ("MAC"), would have paid claims that violated certain Medicare rules.  Lalla Report at Rel.'s Appx. 1926.  HCAT moves to exclude his testimony on the grounds that he is not qualified, and his opinions are unreliable and irrelevant.  Defs.' Mot. Exclude Lalla 1–3 [410].  Because the Court finds that Dr. Lalla's opinions meet the requirements of Rule 702, the Court denies the motion to exclude his testimony.

## A.      *Dr. Lalla is Qualified*

Dr. Lalla has significant experience that is relevant to the dispute at hand.  For five years, Dr. Lalla served as the medical director of Novitas — the specific MAC responsible for adjudicating claims submitted by Texas providers for Medicare reimbursement.  Lalla Report at Rel.'s Appx. 1922.  Currently, he is the medical director of another MAC.  Rel.'s Appx. 4529.  He is also a medical doctor who practiced as a surgeon for twenty years and who submitted claims to Medicare during his practice.  *Id.* at 4529, 5080.  During his time at Novitas, he developed specific medical policies that Novitas used to made decisions in processing Medicare claims.  Lalla Report at Rel.'s Appx. 1922.  This level of relevant work experience combined with training and education render Dr. Lalla qualified to testify on the subjects that he outlines in his expert report.  But HCAT still takes issue with two specific areas of testimony.

First, HCAT argues that Dr. Lalla not qualified to testify regarding primary care documentation via Allscripts.  HCAT specifically points out that Dr. Lalla's clinical practice was as a surgeon, not a primary care physician, and that he does not have any experience with Allscripts.  Defs.' Mot. Exclude Lalla 4–5.  However, these facts do not render him unqualified.  First, regardless of whether he submitted claims to Medicare as a primary care provider, his experience as medical director of the MAC that handles Medicare claims from Texas renders him competent to testify as to whether Medicare would pay certain primary care claims.  Additionally, he does not opine on the functionality of Allscripts.  Instead, he reviews the documentation of claims that were created in Allscripts to see if Novitas would have paid them.  To do so, he relies on a different expert

MEMORANDUM OPINION AND ORDER – PAGE 17

to explain the technical functions of Allscripts.  *See* Lalla Report at Rel.'s Appx. 2010.
Because he is not testifying as to the technical functionality of Allscripts, his lack of
personal experience with the software is immaterial.

Second, HCAT argues that Dr. Lalla is not qualified to testify regarding Texas scope
of practice regulations.  However, Dr. Lalla does not opine on any nuances of Texas scope
of practice rules.  As one example, he opines that Novitas would not have paid for Annual
Wellness Visits performed entirely by medical assistants.  *See* Lalla Report at Rel.'s Appx.
1949, 1956 ("Certain components of the AWV . . . must be performed by a physician or
mid-level for Novitas to pay for those services.").  In making this opinion, he cites to the
Texas Occupational Code twice, only for the propositions that (1) Texas requires a license
to practice medicine, and (2) that diagnosing or treating a disease qualifies as practicing
medicine.  *Id.* at 1949.  Dr. Lalla's experience as the medical director for the MAC
adjudicating Texas Medicare claims qualifies him to opine on whether it would have paid
a claim by an unlicensed medical assistant.

Accordingly, the Court finds that Dr. Lalla is qualified to render the opinions he
produced in his expert report.

### B. Dr. Lalla's Opinions are Reliable and Are Not Improper State of Mind Testimony

Next, HCAT argues that Dr. Lalla's opinions are unreliable because he "used no
methodology" in selecting and analyzing claims.  Defs.' Mot. Exclude Lalla 7.  It further
argues that his opinions on PEP practices are unreliable because he improperly testifies as

to motive.[3]   Reviewing the record, the Court concludes that Dr. Lalla's opinions are reliable.

Dr. Lalla's expert opinions look at HCAT's alleged practices and whether Medicare, through Novitas, would pay claims based on those practices.  To do this, Dr. Lalla "scrolled through" the produced claims dataset to find examples of different categories of claims.  Rel.'s Appx. 5099.  Then, with exemplars in hand, he could render his opinions on whether different types of claims would have been paid.  Scrolling through the universe of claims is certainly not a statistically sound method.  But that is irrelevant here, as Dr. Lalla does not extrapolate from his examples or attempt to quantify the number of false claims at issue.  Every claim he utilizes in his report is illustrative of certain healthcare practices that he believes would result in a nonpayable Medicare claim.  If he were attempting to use a sample of claims to quantify the total number of false claims in the entire population, then he would have needed to use a statistically sound methodology.  But for his purposes, simply finding example claims and then applying his expertise to determine whether Medicare would have paid claims of that type is a sufficiently reliable methodology.

HCAT also argues that his methods were internally inconsistent because Dr. Lalla sometimes looked at multiple progress notes for one claim, while at other times he only looked at one progress note.  Defs.' Mot. Exclude Lalla 9–10.  Taylor, in response, argues

---

[3] HCAT also attempts to argue that Dr. Lalla's opinions about standing orders are unreliable because they go beyond his expertise and ignore black-letter law.  Defs.' Mot. Exclude Lalla 13–14.  The Court found above that Dr. Lalla is qualified to testify as to his opinions in his expert report.  And the Court views that HCAT's "black letter law" challenge is an attack on Dr. Lalla's conclusions, not his methods, and therefore goes to the weight of the evidence and not its admissibility.

that for certain claim types, multiple notes were needed to determine the propriety of the claim while for others, only reviewing one note was sufficient.  Rel.'s Resp. Lalla 21–22 [447].  And in deposition, Dr. Lalla stated that for certain types of claims, the progress note "stands alone" and must illustrate its compliance with Medicare rules.  Rel's Appx. 5103.  To the extent that HCAT believes Dr. Lalla should have reviewed more information, it can make that argument to the factfinder.  Here, his methods are sufficient to satisfy the requirements of Rule 702.

Beyond reliability, HCAT argues that Dr. Lalla gives improper testimony as to HCAT's "motive or intent."  Defs.' Mot. Exclude Lalla 12–13.  Generally, an expert witness's "conclusory assertions regarding a defendant's state of mind are not helpful or admissible."  *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007) (per curiam) (citing *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992)).

Dr. Lalla's statements, however, are not such conclusory assertions.  HCAT objects to multiple of Dr. Lalla's statements in his "factual basis" section that ascribe a motive to HCAT.  Defs.' Mot. Exclude Lalla 12–13.  Specifically, Dr. Lalla states:

> One motive Dr. Powell and others at HCAT expressed for establishing PEP was ensuring HCAT performed Annual Wellness Visits ("AWV") for Medicare patients . . . .  Another motive expressed in the case record was for the PEP department was [sic] to capture HCC codes for Medicare patients. Dr. Powell referred to this process as "mining" HCC diagnoses from the PEP patients. . . . Another motive expressed was for the PEP department to provide, in effect, annual physical examinations to Medicare patients even though Medicare does not pay for those examinations.

MEMORANDUM OPINION AND ORDER – PAGE 20

Lalla Report at Rel.'s Appx. 1935–36 (citations omitted).  In stating this factual basis, Dr.

Lalla cites to multiple exhibits which he believes states these motives as fact.  *Id.*; Rel.'s

Resp. Lalla 22–23.  To the extent that these documents do state these motives as fact, Dr.

Lalla can refer to them as a basis for his opinions.  *Cf. In re Payment Card Interchange*

*Fee and Merchant Discount Antitrust Litig.*, 2022 WL 15044626, at *31 (E.D.N.Y. 2022)

(stating "the Court finds that [expert] cites to a source stating as a fact that the party or

nonparty had that state of mind and therefore does not offer a claim about state of mind as

his expert opinion, but rather references this fact . . . as the *basis* for his ultimate opinion."

(cleaned up) (quoting *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,

2011 WL 6288415, at *8 (E.D.N.Y. 2011))).

Further, Dr. Lalla's actual opinions do not purport to offer improper testimony as to

HCAT's intent.  HCAT takes issue with a specific opinion where Dr. Lalla states that

"HCAT billed for diagnostic tests ordered and performed by PEP Staff before the provider

visit and without the sufficient *intent* from the provider."  Lalla Report at Rel.'s Appx.

1954 (emphasis added).  However, looking at the context for this opinion, it is clear that he

is not actually opining on the physician's intent.  Instead, he is rendering opinion on

whether the progress notes he reviewed had sufficient *documentation* of the provider's

intent.  *See id.* at 1951–54.  Accordingly, his opinions on this point do not present improper

testimony to HCAT's motives or intent.

### C.      *Dr. Lalla's Opinions on ABI and Sudomotor Tests are Relevant*

Finally, the Court concludes that Dr. Lalla's opinions on ankle-brachial index

("ABI") tests and sudomotor tests are relevant.  HCAT argues that Dr. Lalla's opinions on

these subjects are only relevant to Taylor's proposed Third Amended Complaint, which Court denied leave to file.  Defs.' Mot. Exclude Lalla 15–16.  However, the operative complaint does allege that the PEP department billed for ABI and sudomotor tests that should not have been covered by Medicare.  *See* Second Am. Compl. ¶¶ 181–93.  To the extent that Dr. Lalla opines on improper ABI and sudomotor tests conducted within the PEP department, his opinions are relevant.  Should Taylor attempt to introduce otherwise irrelevant testimony at trial, it can be addressed by a timely objection.

Thus, because Dr. Lalla is qualified and because his opinions are reliable and relevant, the Court denies the motion to exclude his testimony.

## VI.   THE COURT DENIES THE MOTION TO EXCLUDE MORELL'S TESTIMONY

Taylor seeks to have Juliette Morell testify as a nonretained expert on the subjects of (1) Medicare coding and billing best practices and compliance, (2) Medicare claims auditing, and (3) medical chart review as it relates to Medicare billing.  Morell Disclosure at Rel.'s Appx. 7382.  Taylor also seeks to have Morell testify as a fact witness based on her employment with HCAT.  *Id.*  HCAT, in turn, seeks to have Morell's expert testimony excluded on the grounds that she is not qualified and her testimony is composed of impermissible legal conclusions, not based on personal knowledge, irrelevant, unreliable, and overly prejudicial.  Defs.' Mot. Exclude Morell 2–3 [411].  Based on the record, the Court concludes that Morell's testimony meets the requirements of Rule 702 and Rule 403.

### A.   *Morell is Qualified*

The Court finds that Morell is qualified to testify as an expert on Medicare coding and billing best practices, claims auditing, and chart review.  Morell has more than twenty

MEMORANDUM OPINION AND ORDER – PAGE 22

years of experience with healthcare compliance.   Rel.'s Resp. Morell 1 [449].   She described herself as "highly knowledgeable" on the subject of medical coding as of 2018. Rel.'s Appx. 5166.   She has testified as an expert regarding compliance with Medicare regulations in three other cases.   *Id.*  At the time of her employment with HCAT she was a certified professional coder.   *Id.* at 5166–67.   She was also certified as a professional medical auditor.   *Id.* at 5167.   She has held herself out as a nationally recognized expert in revenue cycle compliance.   *Id.*  She has eighteen years of consulting experience in the field of medical coding.   *Id.* at 4537.   Based on this experience and specialized knowledge, Morell is qualified to testify as an expert on Medicare coding, billing, claims auditing, and chart review.

### B.     *Morell's Testimony is Based on Personal Knowledge*

As a nonretained expert, Morell is permitted to rely on information that she received within the scope of her employment.   Nonretained expert witnesses "are typically limited to testifying about their opinions formed as a result of their knowledge of the case gained through direct observation."   *Ferrara Land Mgmt. Miss., LLC v. Landmark Am. Ins. Co.*, 2021 WL 4819461, at *2 (S.D. Miss. 2021).   These witnesses "must testify from the personal knowledge they gained on the job," which "may limit their testimony." *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 371 (7th Cir. 2017); *accord Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 253 (4th Cir. 2022).   "These experts still 'may be asked questions that implicate their expertise,' however, 'they cannot be asked to opine about broader issues beyond their own personal involvement.'" *Jesus Church of Victoria Tex., Inc. v. Church*

*Mut. Ins. Co.*, 627 F. Supp. 3d 715, 723 (S.D. Tex. 2022) (quoting *Ferrara Land Mgmt.*, 2021 WL 4819461, at *2).

Courts permit nonretained experts to rely on information they would be expected to rely on as experts in their field. *See, e.g.*, *Thomas v. T.K. Stanley, Inc.*, 2014 WL 12910539, at *2 (E.D. Tex. 2014) (permitting nonretained expert physicians to rely on "blood work, x-rays, and MRIs, and reports from specialists"); *cf. Hegwood v. Ross Stores, Inc.*, 2007 WL 4570550, at *5 n.2 (N.D. Tex. 2007) (noting that "Rule 703 provides that experts may consider non-admissible evidence in forming opinions if of a type reasonably relied up on by experts in the particular field"). However, a nonretained expert may not offer opinions that were produced specifically in preparation for trial. *Jesus Church of Victoria*, 627 F. Supp. 3d at 724.

Based on the record, the Court concludes that Morell has sufficient personal knowledge. HCAT levies a number of arguments about Morell's personal knowledge, many stemming from her reliance on information from other HCAT employees or records. *See* Defs. Mot. Exclude Morell 11–16. But Morell served as HCAT's Coding Manager. Rel.'s Resp. Morell 1. In this role she was asked to create revenue cycle management and coding policies and procedures. Rel.'s Appx. 5178. It is reasonable for an expert in a like position to receive information from other employees to verify whether coding and billing policies are functioning. As an example, HCAT takes issue with Morell's understanding of credentials within HCAT's physical medicine department because it "always had been based exclusively on what another employee told her, not what she personally knows." Defs.' Mot. Exclude Morell 12. But if the credentialing of physical medicine providers

MEMORANDUM OPINION AND ORDER – PAGE 24

was relevant to how HCAT billed for those services, then she was permitted to ask another knowledgeable HCAT employee about those credentials.  She need not personally investigate the credentialling status of those providers when another HCAT employee had such knowledge.  Thus, Morell has personal knowledge to testify to matters of coding, billing, and related issues where she received information during her employment at HCAT.

HCAT further takes issue with some of Morell's deposition testimony, arguing that she renders opinions based on "documents at deposition that she has never seen."  *Id.* at 11.  Of course, a nonretained expert cannot render abstract opinions only created for trial. Morell's testimony must be confined to applying her expertise to the facts she encountered on the ground at HCAT.  *See Jesus Church of Victoria*, 627 F. Supp. 3d at 724.  If Taylor attempts to offer opinion testimony through Morell that is unrelated to her experience at HCAT, then such testimony can be addressed at trial with a timely objection.

### C.    *Morell's Testimony is Relevant, Reliable, and Not Overly Prejudicial*

Next, HCAT argues that four of Morell's disclosed opinions are not relevant to the operative complaint.  Defs.' Mot. Exclude Morell 17.  Specifically, it points to her opinions on CPT codes 95923 (sudomotor test) and 93923 (ABI), signature stamps, tilt table tests, and improper E&M level codes.  *Id.*  However, the Court finds that this testimony is relevant to the operative Second Amended Complaint.

On sudomotor and ABI codes, the complaint alleges that the PEP department submitted claims to Medicare for these services that should not have been covered.  *See*

Second Am. Compl. ¶¶ 181–93.  Thus, to the extent that Morell's testimony will address the billing of sudomotor and ABI tests from the PEP department, her testimony is relevant.

On the use of signature stamps, the complaint alleges that procedures were being billed as if rendered by a physician who did not actually render the service.  *See* Am. Compl. ¶¶ 121–161.  The use of signature stamps could plainly aid in this alleged activity. Thus, this testimony is relevant.

On the use of a tilt table within HCAT's physical medicine department, the complaint contains allegations about improper incident-to billing at HCAT's physical medicine department.  Am Compl. ¶¶ 150–161.  Testimony about billing for tilt table services without possessing a tilt table is relevant at least to the issue of knowledge of false billing within the physical medicine department.

Finally, on the use of improper or inflated E&M codes, the complaint alleges that the PEP department was billing for services and office visits that it should not have been under the Medicare AWV framework.  Second Am. Compl. ¶¶ 162–214.  Without the full context of trial, the Court views that testimony about inflating E&M codes by billing for services or amounts of time not actually spent with the patient is likely relevant.  To the extent that Taylor intends to introduce truly irrelevant testimony, it can be handled via appropriate objection at trial.

The Court also concludes that Morell's testimony is reliable.  As a nonretained expert, any opinions she renders must stem from the application of her specialized knowledge to the facts she encountered while employed at HCAT.  Based on her expert disclosure, she intends to opine on a variety of Medicare rule violations she claims to have

encountered while at HCAT.  *See* Morell Disclosure at Rel.'s Appx. 7383–85.  The application of her own experience, training, and knowledge in the field of medical coding and billing to the facts that she encountered at HCAT is a sufficiently reliable means to opine about the propriety of HCAT's coding and billing practices.  HCATs arguments about the sources she relies on or her lack of understanding of Medicare requirements go primarily to the weight of her testimony.  She is qualified based on her experience and training and is permitted to apply that experience and training to the set of facts that she encountered while working for HCAT.

Additionally, her testimony is not overly prejudicial such that it should be excluded under Rule 403.  As noted above, her testimony is relevant to the allegations in the operative complaint.  At minimum, it is probative of HCAT's knowledge that it may be submitting false claims to Medicare.  *See* 31 U.S.C. § 3729(a).  Further, the Court does not find that her testimony is overly cumulative.  HCAT argues that it is so because Taylor's other experts intend to opine on similar subjects.  Defs.' Mot. Exclude Morell 24.  However, as a nonretained expert, Morell will be able to testify both as a fact witness and as an expert, applying her experience and specialized knowledge to those facts she encountered while employed at HCAT.  This is different than if Taylor had simply retained a second expert to render the exact same opinions as a different retained expert.  Here the

testimony comes from a different perspective and is not overly cumulative.[4]  Accordingly, the Court declines to exclude it under Rule 403.

### D.      *Objections to Legal Conclusion Testimony are Better Addressed at Trial*

The Court is of the opinion that objections to any legal conclusion testimony are better addressed with the context provided at trial.  HCAT argues that many of Morell's opinions, as framed in her expert disclosure, are impermissible legal conclusions.  Defs. Mot. Exclude Morell 5.  Certainly, an expert witness cannot "state dispositively what the law is, and that certain actions are 'illegal.'"  *Crinel*, 2016 WL 6441249, at *9.  However, an expert is permitted to "explain a complicated area of the law and the facts related to it" so long as she does not "conclude that a defendant violated the law."  *Okoroji*, 2018 WL 8756434, at *1.

Here, Morell is a nonretained expert and therefore was not required to submit a written report under FED. R. CIV. P. 26(a)(2).  Without such a report, the Court does not have a precise formulation of Morell's opinions to review.  The parties are cautioned that expert opinion testimony consisting of legal conclusions will not be admitted.  However, the Court believes that objections to such testimony are better handled with the context available at trial.  Accordingly, the Court declines to rule on this issue at this stage and will address it at trial via appropriate objection.

---

[4]  HCAT also argues that issues with Morell's memory could render her testimony confusing to the jury.  These potential memory issues and confusion risk are best addressed at trial.

MEMORANDUM OPINION AND ORDER – PAGE 28

Because the Court finds that Morell is qualified as an expert and her testimony is reliable, relevant and based on sufficient personal knowledge, HCAT's motion to exclude her testimony is denied.[5]

## VII.   THE COURT DENIES THE MOTION TO EXCLUDE TESTIMONY OF SCOTT, ROSS, AND KROCK

Taylor retained Scott, Ross, and Krock ("Stout Witnesses"), who are employees of Stout Risius Ross, LLC, to analyze the voluminous medical records produced by HCAT and to quantify the number and dollar amount of false claims submitted to Medicare.  Rel.'s Resp. Scott 4–5 [452].  This analysis began with two raw datasets — Novitas claims data and HCAT medical records.  *Id.* at 12.  Scott and Ross began by writing a computer program to process the raw medical records in order to identify progress notes and to extract specific data from them.  *Id.* at 12.  Ross also processed the Novitas claims data in order to remove resubmitted claims and claims that are not relevant to Taylor's allegations.  *Id.* at 12–13.  Then, these two sets of processed records were joined together, and Scott filtered the data using specific criteria to identify and count false claims.  *Id.* at 13.  After completing the analysis, Krock performed a statistical validation study to confirm the validity of Scott's results.  *Id.* at 15.

---

[5] HCAT also moves for the Court to exclude any lay opinions rendered by Morell.  Because the Court finds Morell is qualified as an expert, the Court declines to rule on the issue of lay opinion.

HCAT argues that each of these experts' opinions should be excluded for a variety of reasons including unreliability, lack of qualifications, and irrelevance.[6]  Defs.' Mot. Exclude Scott 1–2 [412].  However, upon review of the record, the Court concludes that each expert has satisfied the requirements of Rule 702 and should not be excluded.

### A.      Scott, Ross, and Krock are Qualified

Reviewing Scott's credentials and experience, the Court concludes that she is qualified as an expert in medical coding, billing, and regulatory compliance.  Scott has significant experience in these fields.  She is certified in healthcare compliance and is a certified professional coder.  Rel.'s Appx. 4706.  Since 2016 she has held leadership positions in multiple healthcare consulting firms.  *Id.* at 4706–07.  Additionally, she has nearly ten years of experience working in healthcare revenue cycle departments.  *Id.* at 4707–09.  She has experience as a billing and compliance analyst at Kaiser Permanente. *Id.* at 4709.  She has trained healthcare auditors to investigate fraudulent billing practices and has authored a publication chapter about medical coding and reimbursement.  *Id.* at 4707, 4709.  Based on this experience and her certifications in the field, the Court concludes that Scott is qualified to testify as an expert on healthcare coding, billing, and regulatory compliance.

Ross, as part of Scott's team, worked to implement Scott's criteria into computer code to enable analysis of the claims and progress note data.  *See* Rel.'s Appx. 7364–77.

---

[6] HCAT also argues that Scott gives improper legal conclusions.  As stated above, the Court is of the opinion that objections to legal conclusions are best addressed at trial. Accordingly, they are not addressed here.

His expert testimony in this matter is confined to the methodology used by the Stout Witnesses to quantify false claims.  Rel.'s Resp. Scott 7–8.  To this end, Ross has experience with data analytics supporting expert reports in multiple healthcare litigation matters.  Rel.'s Appx. 7379.  He also has data analysis experience with other matters including insurance and bankruptcy disputes.  *Id.* at 7379–80.  He has a bachelor's degree in finance and information systems.  *Id.* at 7378.  Based on this experience and education, the Court concludes that he is qualified as an expert in the area of data analytics.

Krock's role on the team was to design a statistical validation study to determine how reliable Scott's analysis was.  Rel.'s Resp. Scott 5.  Krock has a Ph.D. in economics and has extensive training in statistical methods.  Krock Report at Defs.' Appx. 1004 [406].  He leads the Economic Consulting Practice at Stout and has testified as a damages expert in many different types of cases.  *Id.*  He has experience working as a consultant within the healthcare industry and provides statistical analysis and guidance to related to public and private healthcare payment disputes.  *Id.*  The Court finds that this education and experience qualifies Krock to testify to the statistical validity and resulting damages calculation for Scott's analysis.

### B.    *Scott, Ross, and Krock's Opinions are Reliable*

As described above, the Stout Witnesses counted the number of false claims in the provided HCAT and Novitas datasets through the use of computer analysis.  To perform this analysis, Scott began by identifying categories of potentially false claims and stating the Medicare rules that she used to generate her filtering criteria.  *See, e.g.*, Scott Rep. at Rel.'s Appx. 4569.  Then, Scott and Ross would translate the Medicare requirements into

data filters, execute a computer program to identify and return records of claims matching that filter, and then count up the number of false claims returned. *See, e.g.*, *id.* at 4582–85; Rel.'s Appx. 5275 (noting Ross's statement that Scott would "instruct me on the criteria . . . and I would apply the criteria"). In total, Scott and Ross evaluated and quantified 30 groups of claims that Scott identified as false. *See* Rel.'s Appx. 7822 (native Excel files listing each identified claim in each group). This method allowed Scott and Ross to directly count the number of claims that met Scott's criteria for falsity. It was not based on extrapolation from representative sample, but instead was a numeric count of progress notes and claims records that, in Scott's opinion, are inconsistent with Medicare requirements.

Then, after Scott and Ross's analysis was complete, Krock designed and performed a statistical validation study. He performed statistical sampling of each of Scott's claim groups that found more than fifty total claims (nineteen groups). Krock Report at Defs.' Appx. 1008. Six of Scott's groups returned fewer than fifty claims, so Krock and Scott manually validated every claim in those groups. *Id.* Then, for the last five groups, Scott determined that these groups were per se false based on the Medicare rules and Krock did not statistically validate them. *Id.* Krock designed his study to use a one-tailed criteria with a 90% confidence interval. *Id.* at 1010. His validation study returned a result of 100% accuracy — every single claim that was randomly selected to be part of his representative sample was found to meet Scott's criteria. *Id.* at 1013.

Looking at this process overall, the Court concludes that it is sufficiently reliable. A team of three qualified experts brought their skills together to directly count the number of HCAT's claims that meet the falsity criteria used by Scott. Then, they performed a

MEMORANDUM OPINION AND ORDER – PAGE 32

statistical validation, to identify a possible error rate in this count, and found a 100% success rate. The methodology utilized by the Stout Witnesses is sufficiently reliable to satisfy the requirements of Rule 702.

HCAT attacks this method's reliability on a number of grounds, but the Court does not find these arguments persuasive. First, it argues that Scott and Ross treated two sets of claims data differently, and thereby used an unreliable method. Defs.' Mot. Exclude Scott 14–15. However, it appears that the change in script methodology was designed only to reduce the processing time of the script. Rel.'s Appx. 5372. Scott testified that the difference in the result outputs between the two scripts was not material. *Id.* at 5372–73. Additionally, the validation study did not find any claims that did not meet the expected results. Accordingly, this efficiency change in the script does not render the methodology unreliable.

Second, HCAT argues that the method is unreliable because it only looked at "cherrypicked" claims data. Defs.' Mot. Exclude Scott 16. However, the data used was based on the categories of claims identified in then–Magistrate Judge Ramirez's discovery order. *See* Order, November 23, 2022 [157]. All of HCAT's Medicare claims data was produced to a third-party analyst, Joshua Dennis, who filtered the data to match with the specified categories of claims. This filtering created the limited set of claims data relevant to this dispute. The Stout Witnesses are entitled to base their analysis on this relevant dataset.

Third, HCAT argues that Scott did not correctly apply incident-to billing requirements in generating her data filters. Defs. Mot. Exclude Scott 18–21. However,

this does not make her analysis unreliable.  She is qualified as an expert in medical billing and coding and has significant experience in the area.  As such, she is entitled to apply that experience and knowledge to the facts of the case.  To the extent HCAT disagrees with her applications of the rules to the facts of this case, it may present those arguments at trial.  It does not appear to the Court that any such errors (if there are errors at all) are so pervasive as to render her opinion unreliable.

Fourth, HCAT argues that Ross's opinions are unreliable because he treated the two datasets differently and that his produced script did not work correctly.  *Id.* at 30–37.  On the treatment of the two datasets, the Court already determined that this did not render Scott's opinion unreliable.  It also does not render Ross's opinion unreliable.  As for the code not working, Taylor disputes that it was broken.  Rel.'s Resp. Scott 38.  She asserts that HCAT did not follow the method identified in Ross's declaration that allows the script to operate.  *Id.* at 39.  Additionally, Ross and Scott produced the entire set of claims that they identified as violating Scott's falsity criteria.  *See* Rel.'s Appx. 7822.  Accordingly, HCAT could still verify the output as needed.  His opinion, then, is reliable.

Sixth, HCAT argues that Krock's opinions are unreliable because he opines on some claim categories that he did not randomly sample and because he is not qualified to opine on Medicare regulations.  Defs.' Mot. Exclude Scott 39–42.  These arguments miss the point.  Krock elected not to randomly sample two groups of claims: (1) those where the category of claims had fewer than fifty results, and (2) those categories that Scott determined were per se false.  Krock Report at Defs.' Appx. 1008.  For the groups with fewer than fifty records, he manually reviewed every record for validity.  *Id.*  No random

MEMORANDUM OPINION AND ORDER – PAGE 34

sampling was required because he confirmed the validity of each record directly.  For the per se false categories, he relied on Scott's determination that, based on the Medicare rules, every claim matching those filters must be false.  *Id.*  If the factfinder accepts Scott's position on those categories, then statistical sampling for validity is not required.  On Krock's qualifications, he need not be an expert in Medicare regulations because his opinions only discuss a statistical validation of Scott's work.  Of course, Scott needs to be an expert on healthcare coding and billing to render her opinions.  And she is.  But Krock's expertise only needs to encompass statistical methods and damages calculations — subjects for which the Court has already concluded Krock is qualified.

Accordingly, the Court finds that Scott, Ross, and Krock's opinions are sufficiently reliable to meet the requirements of Rule 702.

### C.       *Scott's Opinions are Relevant*

HCAT targets three specific opinions by Scott, arguing that they fall outside the scope of the operative complaint.  It argues that Scott Opinion 2 discussed the Stark law, which is not pleaded in the complaint, and that Scott Opinions 6 (sudomotor tests) and 7 (ABI tests) include claims that were only relevant to the nonoperative Third Amended Complaint.  Defs. Mot. Exclude Scott 22.  The Court disagrees.

On the Stark law, Scott includes her discussion of the Stark law as part of her background to her opinion.  Scott Report at Rel.'s Appx. 4586–87.  She brings it up because she believes HCAT relied on the Stark law when establishing its policies about which providers should bill which services.  *Id.* at 4590–91.  However, her actual opinion is that HCAT "falsely represented the physician that rendered services."  *Id.* at 4586.  The SAC

does allege that HCAT falsely billed claims under the name of a founding physician who did not actually render the services.  Second Am. Compl. ¶¶ 121–61.  Thus, this opinion is relevant, regardless of her discussion of the Stark law.

On sudomotor tests and ABI tests, the complaint alleges that these types of tests were falsely billed from the PEP department.  *See* Second Am. Compl. ¶¶ 181–93.  Scott's opinion does not appear on its face to be limited to the PEP department, but Taylor asserts that Scott's rebuttal report removes claims for sudomotor tests and ABI tests that did not originate from the PEP department.  Rel.'s Resp. Scott 33.  Thus, to the extent Scott opines on sudomotor and ABI tests from the PEP department, her testimony is relevant.  Should Taylor attempt to introduce truly irrelevant testimony at trial, it can be addressed by appropriate objection.

### D.  *The Court Declines to Impose an Exclusion Sanction for Untimely Discovery*

Finally, HCAT seeks to have Scott, Ross, and Krock's expert reports excluded as a discovery sanction for failure to meet deadlines.  HCAT claims that (1) Taylor did not timely produce supporting data for Scott's report, (2) Taylor did not timely designate Ross as an expert, and (3) Taylor did not timely produce supporting data for Krock's report.  Defs.' Mot. Exclude Scott 44–48.  Because the Court finds that any untimeliness on Taylor's part was harmless, the Court declines to impose an exclusion sanction.

Federal Rule of Civil Procedure 26(a)(2) requires parties to disclose the identity of expert witnesses and to provide a written report prepared by the witness.  FED. R. CIV. P. 26(a)(2).  Among other things, the written report must include "the facts or data considered by the witness in forming" his opinions and "any exhibits that will be used to summarize

or support them." *Id.* These disclosures and reports must generally be full and final. *See Reliance Ins. Co. v. La. Land & Expl. Co.*, 110 F.3d 253, 256–57 (5th Cir. 1997) (affirming refusal to allow expert to add an opinion on a new issue after expiration of the deadline); *Beller ex rel. Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003) (noting that permitting supplemental expert reports "would surely circumvent the full disclosure requirement implicit in Rule 26").

Under Rule 37(c), if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c). In considering whether a violation is harmless, the Court considers:

> (1) the explanation, if any, for the party's failure to comply with the discovery order; (2) the prejudice to the opposing party of allowing the witnesses to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the importance of the witnesses' testimony.

*Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996). "The Court has broad discretion in deciding whether a violation of Rule 26(a) is substantially justified or harmless." *Reyes v. City of Farmers Branch*, 2008 WL 4791498, at *3 (N.D. Tex. 2008).

Taylor's three-day-late production of supporting materials for Scott's opinion was harmless. Special Master Order No. 16 [377] set Taylor's expert disclosure deadline at June 7, 2024. Taylor designated Scott as an expert and produced her report on that date. Defs.' Appx. 609. However, there was an apparent technical issue and supporting appendices did not get uploaded until the issue was caught and addressed on June 9. *See*

MEMORANDUM OPINION AND ORDER – PAGE 37

*id.* at 265–66.  Similarly, the declaration of Ross that Scott relied upon also appeared to not be uploaded on time and was submitted to HCAT on June 10.  *Id.* at 269.  These delays of two and three days did not materially prejudice HCAT.  HCAT deposed Scott on July 17, more than one month after receiving her supporting material.  *Id.* at 1818.  Accordingly, this delay was harmless.

Taylor's late designation of Ross as an expert was harmless.  Initially, Taylor did not intend to call Ross to testify at trial.  Rel.'s Resp. Scott 44.  As discussed above, Ross's function on the Stout team was to perform the technical implementation of Scott's analysis.  In line with this role, Scott references Ross's work in her report.  In support of this, Taylor produced Ross's declaration on June 10.  Defs.' Appx. 269.  HCAT, unsatisfied, sought to depose Ross after receiving this material.  Joint Status Report 9 [392].  Taylor voluntarily produced Ross for deposition on July 12 and designated him as an expert the same day.  *Id.* While this was more than one month after Taylor's June 7 deadline, HCAT was fully aware of Ross's function on the Stout team.  Ross's expert opinion is generally confined to the methodology employed by Scott to effectuate her data analysis.  Rel.'s Resp. Scott 7–8.  And in addition to deposing him on this subject, HCAT has produced its own experts rebutting Ross's methodology.  *E.g.*, Russo Report at Appx. Supp. Rel.'s Mot. Exclude Gosfield 526 [456].  Accordingly, HCAT was not prejudiced by this late disclosure.

Taylor's late production of Krock's supporting materials was harmless.  Taylor designated Krock as an expert and produced his report on June 7.  Defs.' Appx. 609–10.  In response, HCAT requested native files for Krock's appendices as well as the "seed" information for the statistics program he used.  *Id.* at 619–22.  Taylor produced these items

on June 10. *Id.* As with Scott, this three-day-late production is harmless, as it occurred well before Krock's July 10 deposition. *Id.* at 1704. Following Ross's deposition, HCAT believed that Ross provided materials to Krock that he relied on in his opinions. *See id.* at 629. From the information present in the appendix, it is unclear whether or not any such materials existed, and if they did, what prejudicial effect they could have on HCAT. In its motion, HCAT does not articulate any prejudice other than the fact that it had to ask for this material. Accordingly, any late production of this material is harmless.

Because the Court finds that Scott, Ross, and Krock are qualified, their opinions are reliable and relevant, and their reports should not be excluded as a sanction, the Court denies the motion to exclude their testimony.

## VIII. THE COURT DENIES THE MOTION TO EXCLUDE DENNIS'S TESTIMONY

Dennis's involvement in this case began when Taylor selected him, pursuant to a Special Master order, to act as a third-party vendor to filter Novitas claims data. A discovery dispute arose when Taylor sought all of HCAT's claims data from Novitas, the MAC to which HCAT submitted its Medicare claims for processing. *See* Rel.'s Mot. Compel 1 [241]. In response, the Special Master ordered Taylor to choose a third-party vendor to receive the Novitas data, filter the data to eliminate irrelevant claims, and produce to Taylor the relevant claims. Special Master Order No. 3, at 1–2 [321]. Josh Dennis was the individual who performed this filtering. Dennis Report at Rel.'s Appx. 1070. Subsequently, Taylor designated Dennis as an expert to testify about this filtering process. *See id.* Now, HCAT argues that this designation violates Special Master Order No. 3 and thereby renders his opinions unreliable. Because the Court finds Dennis's designation does

MEMORANDUM OPINION AND ORDER – PAGE 39

not violate Special Master Order No. 3 and his opinions are reliable, the Court denies the motion to exclude him.

Taylor's designation of Dennis as an expert did not violate Special Master Order No. 3.  This order stated, in relevant part:

> Novitas shall produce to a third-party vendor (which Relator will identify) all Defendants' Medicare claims in its possession from 2015–2021.  The third party shall filter the Novitas claims responsive to Relator's amended subpoena to Novitas by using Relator's search filters submitted in connection with Joint Submission ECF 280.

Special Master Order No. 3, at 1–2 (citation omitted).  HCAT argues that this order required the third party to be an "independent, neutral" third party, and that Dennis's report should be excluded because it violates this requirement.  Defs.' Mot. Exclude Dennis 89, 11 [413]. However, neither the word "independent" nor the word "neutral" appears anywhere in the order.  Additionally, Dennis specifically testified that Taylor and her counsel never had access to the raw Novitas data before Dennis filtered it.   Rel.'s Appx. 4954, 4985. Accordingly, Taylor and Dennis did not violate Special Master Order No. 3 by designating Dennis as an expert to testify on his filtering methodology.

Additionally, HCAT claims that Dennis's testimony cannot be reliable because he "surreptitiously acted as an expert for Relator" while also acting as this third-party vendor. Defs.' Mot. Exclude Dennis 9.  The Court does not find this argument persuasive.  HCAT asserts that because Taylor's counsel made privilege objections during Dennis's deposition, that HCAT cannot know "the full extent of what searching and analysis Mr. Dennis did."  *Id.* at 10.  However, contrary to this assertion, Taylor's counsel instructed

Dennis "not to go into communications with counsel *except for any communications regarding information that you relied upon or assumptions that were provided to you*." Rel.'s Appx. 4917 (emphasis added).  It is not clear to the Court that any information relevant to Dennis's methodology or reliability was not available to HCAT.  This is especially true when considering that Dennis's entire opinion is just an explanation of the specific data fields and filtering criteria he used to create the Novitas dataset produced to both parties.  *See* Dennis Report at Rel.'s Appx. 1071–76.  And Dennis has fifteen years of experience performing complex data analysis, and frequently uses Structured Query Language ("SQL") and other data analysis tools.  *Id.* at 1068.  His explanation of his methodology stems from this experience and is reliable.

Because Dennis's expert opinions do not violate Special Master Order No. 3 and are reliable, the Court denies the motion to exclude his testimony.

### IX.   THE COURT DENIES THE MOTIONS TO EXCLUDE EXPERT OPINIONS ON CREDENTIALLING AND CORPORATE CONDUCT

In addition to filing motions to exclude each of Taylor's experts, HCAT also filed motions to exclude specific subject matter testimony from the same experts.  Specifically, it filed a motion to exclude expert testimony on credentialling, targeting opinions by Dr. Lalla, Scott, and Ross, and a motion to exclude expert testimony on corporate conduct targeting opinions by Dr. Charalambopoulos, Scott, Anderson, and Dr. Lalla.  Defs.' Mot. Exclude Credentialling 1 [414]; Defs.' Mot. Exclude Conduct 1 [415].

The Court has already concluded that the testimony of each of these experts satisfies the requirements of Rule 702 and should not be excluded.  The additional subject-matter

arguments raised in these motions do not change the Court's analysis.  Each expert's qualifications and methodologies apply across each of his or her opinions, including those on credentialling and corporate conduct.

One argument of note in the corporate conduct motion is that HCAT objects to expert testimony where the expert opines on HCAT's state of mind.  HCAT is correct that an expert cannot directly opine on a defendant's state of mind.  *United States ex rel. Ruscher v. Omnicare, Inc.*, 2015 WL 5178074, at *11 (S.D. Tex. 2015); *see also In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233 (5th Cir. 1986) (noting that "the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument").  However, an expert is permitted to testify that certain practices or behaviors are consistent with a certain state of mind.  *U.S. Commodity Futures Trading Comm'n v. Wilson*, 2016 WL 7229056, at *8 (S.D.N.Y. 2016); *cf. United States v. Dotson*, 817 F.2d 1127, 1132 (5th Cir. 1987) (permitting, in a criminal case, expert testimony that certain facts were consistent with an intent to evade taxes), *vacated in part on other grounds by* 821 F.2d 1034 (5th Cir. 1987).  The parties are cautioned that direct statements of state of mind are not proper expert testimony.  The Court will address any such statements through objections at trial.

Because the Court has found that each of Taylor's above experts satisfy the requirements of Rule 702, the Court denies these subject-matter motions to exclude.

**CONCLUSION**

Because the Court finds that the opinions of Anderson, Dr. Charalambopoulos, Dr. Lalla, Morell, Scott, Ross, Krock, and Dennis meet the requirements of Rule 702, the Court denies HCAT's motions to exclude their testimony.

Signed October 15, 2024.

David C. Godbey
Chief United States District Judge