# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **CHERYL TAYLOR,** | § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **CASE NO. 3:19-CV-02486-N** |
| **HEALTHCARE ASSOCIATES OF TEXAS, LLC, et al.,** | § § § § | |
| **Defendants.** | § § § | |

## RELATOR CHERYL TAYLOR'S BRIEF IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT

**JOHNSTON CLEM GIFFORD PLLC**

**Robert W. Gifford**
State Bar No. 24093543
rgifford@johnstonclem.com

**Daniel S. Klein**
State Bar No. 24052277
dklein@johnstonclem.com

1717 Main Street, Suite 3000
Dallas, Texas 75201
(214) 974-8000 (Telephone)
(972) 474-1721 (R. Gifford Direct)
(972) 474-1750 (Facsimile)

*Attorneys for Relator, Cheryl Taylor*

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT AND GOVERNING LAW ................................................................1

II.  AUTHORITY FOR JUDGMENT ..........................................................................................2

    A.   Defendants Are Jointly and Severally Liable for False Claims Act Damages and Penalties ........................................................................................................2

    B.   Defendants Are Jointly and Severally Liable to the United States for Treble Damages. ..............................................................................................................2

    C.   Defendants Are Jointly and Severally Liable to the United States for a Civil Penalty for Each False Claim They Caused or Conspired to Submit. ...............3

        1.   The Court should apply the $5,500-$11,000 statutory penalty range to each of 644 false claims because that is the largest number of pre-November 2, 2015, claims for which there was evidence at trial.........................4

        2.   The Court should apply the $13,946-$27,894 statutory penalty range to each of the 21,240 remaining post-November 3, 2015, false claims. ........................4

    D.   Federal Courts Consider the Totality of the Circumstances When Determining The Level of Civil Penalty to Assess Within the Statutory Range. ....................5

        1.   Defendants' conduct was egregious. ................................................................5

        2.   Defendants' conduct was not just knowing, but intentional ..............................7

        3.   The damages to the Government and the volume of Defendants' false claims are significant and warrant significant penalty. ....................................9

        4.   Defendants do not accept the jury's verdict and have not ceased their fraudulent practices.........................................................................................10

        5.   A meaningful penalty is necessary to deter HCAT and others from engaging in fraud of this magnitude against the federal treasury..............................11

    E.   The Court Should Set Civil Penalty Amounts at the Midpoint of the Applicable Statutory Ranges .............................................................................13

    F.   Defendants are Jointly and Severally Liable for Post-Judgment Interest ....................15

III. PRAYER ....................................................................................................................16

# TABLE OF AUTHORITIES

## Cases

Page(s)

*BMW of North Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ............................................................................................................ 9

*Cook County, Ill. v. United States ex rel. Chandler*,
  538 U.S. 119 (2003) ......................................................................................................... 3, 5

*Cripps v. Louisiana Dep't of Agric. & Forestry*,
  819 F.3d 221 (5th Cir. 2016) ........................................................................................... 15

*Grant on behalf of United States v. Zorn*,
  107 F.4th 782 (8th Cir. 2024) ............................................................................................ 3

*Hall v. White, Getgey, Meyer Co., LPA*,
  465 F.3d 587 (5th Cir. 2006) ........................................................................................... 15

*Meaux Surface Prot., Inc. v. Fogleman*,
  607 F.3d 161 (5th Cir. 2010) ........................................................................................... 15

*Southwestern Bell Telephone CO. v. Atlas Trading Conglomerate Inc.*, No. 3:21-cv-01271-K,
  2022 WL 18588062 (N.D. Tex. Feb. 24, 2022) ............................................................... 14

*Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*,
  718 F.3d 448 (5th Cir. 2013) ........................................................................................... 15

*U.S. ex rel. Longhi v. Lithium Power Technologies, Inc.*,
  530 F.Supp.2d 888 (S.D. Tex. 2008) ................................................................................. 5

*U.S. v. Lippert*,
  148 F.3d 974 (8th Cir. 1998) ........................................................................................... 13

*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
  741 F.3d 390 (4th Cir. 2013) .............................................................................. 10, 12, 14

*United States ex rel. Drakeford v. Tuomey*,
  792 F.3d 364 (4th Cir. 2015) ........................................................................................ 5, 13

*United States ex rel. Drummond v. BestCare Lab'y Servs., L.L.C.*,
  950 F.3d 277 (5th Cir. 2020) ............................................................................................. 2

*United States ex rel. Dunleavy v. Cnty. of Delaware*,
  279 F.3d 219 (3d Cir. 2002) .............................................................................................. 2

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
   352 F.3d 908 (4th Cir. 2003) ............................................................................ 10

*United States ex rel. Hueseman v. Professional Compounding Centers of America, Inc.*,
   2024 WL 2244818 (W.D. Tex. May 1, 2024) ................................................... 11

*United States ex rel. Miller v. Bill Harbert Intern. Const., Inc.*,
   501 F. Supp. 2d 51 (D.D.C. 2007) ............................................................... 5, 13

*United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*,
   649 F. Supp. 3d 404 (W.D. Tex. 2023) ....................................................... 14, 15

*United States ex rel. Morsell v. Gen Digital, Inc.*,
   651 F.Supp. 3d 95 (D.D.C. 2023) .................................................................. 13

*United States ex rel. Nottingham v. Thomas*,
   2015 WL 7424738 (E.D. Va. Oct. 26, 2015) .................................................... 3

*United States ex rel. Sorensen v. Outreach Diagnostic Clinic, LLP*, No. H-12-480,
   2021 WL 5310987 (S.D. Tex. Nov. 15, 2021) ............................................ 14, 15

*United States ex rel. Sorensen v. Outreach Diagnostic Clinic, LLP*, No. H-12-480,
   2022 WL 627228 (S.D. Tex. Jan. 3, 2022) ..................................................... 15

*United States ex rel. Sorenson v. Outreach Diagnostic Clinic, LLP*, No. 22-20108,
   2022 WL 18935544 (5th Cir. Sept. 20, 2022) ................................................ 15

*United States v. Aerodex, Inc.*,
   469 F.2d 1003 (5th Cir. 1972) ........................................................................ 2

*United States v. Bajakajian*,
   524 U.S. 321 (1998) ...................................................................................... 14

*United States v. Bd. of Educ. of City of Union City*,
   697 F. Supp. 167 (D.N.J. 1988) ...................................................................... 3

*United States v. Chaplin's Inc.*,
   646 F.3d 846 (11th Cir. 2011) ....................................................................... 14

*United States v. Killough*,
   848 F.2d 1523 (11th Cir. 1988) ..................................................................... 12

*United States v. Mackby*,
   339 F.3d 1013 (9th Cir. 2003) ....................................................................... 11

*United States v. Rogan*,
   2006 WL 8427270 (N.D. Ill. Oct. 2, 2006) .................................................. 3, 5

*United States v. Saavedra,*
  661 Fed. Appx 37 (2d Cir. 2016) ............................................................... 5, 11

*United States v. Shubhada Indus.,*
  2018 WL 2735407 (E.D. Pa. June 7, 2018) ...................................................5

*United States v. Suarez,*
  966 F.3d 376 (5th Cir. 2020) ...................................................................... 14

*Walker v. U.S. Dep't of Hous. & Urb. Dev.,*
  99 F.3d 761 (5th Cir. 1996) ..........................................................................2

*Yates v. Pinellas Hematology & Oncology, P.A.,*
  21 F.4th 1288 (11th Cir. 2021) .........................................................2, 11, 14

## Statutes

28 U.S.C. § 1961 ...............................................................................2, 15, 16
28 U.S.C. § 1961(a) ................................................................................15, 16
28 U.S.C. § 3729(a)(1)(A)-(C) .......................................................................1
31 U.S.C. § 3729 ............................................................................................5
31 U.S.C. § 3729(a)(1) ..............................................................................2, 3
31 U.S.C. § 3729(a)(3) ................................................................................. 16
42 U.S.C. § 1320a-7k(d) ............................................................................. 10

## Rules

Fed. R. Civ. P. 54 ........................................................................................ 16
Fed. R. Civ. P. 58 ....................................................................................... 1, 2
Fed. R. Civ. P. 58(a) ......................................................................................2
Fed. R. Civ. P. 58(b)(2) ..................................................................................2
Fed. R. Civ. P. 58(d) ......................................................................................2

## Regulations

28 C.F.R. § 85.3 .............................................................................................4
28 C.F.R. § 85.3(a)(9) ................................................................................ 3, 4
28 C.F.R. § 85.5 ...................................................................................... 1, 3, 4

## Other Authorities

S. Rep. No. 99-345 (1986) ........................................................................... 11

## I.    PRELIMINARY STATEMENT AND GOVERNING LAW

On November 18, 2024, the jury returned a verdict after a two-week trial. The jury found that Healthcare Associates of Texas, LLC ("HCAT") violated the False Claims Act ("FCA") by submitting 21,844 false claims to the Government and improperly receiving payments totaling $2,753,641.86. The jury also found that Healthcare Associates of Irving, LLP ("HCAI"), David Harbour, Kristian Daniels, Charles Powell, M.D., Walter Gaman, M.D., and Terrence Feehery, D.O. conspired with HCAT to submit the false claims and receive the improper payments.

Pursuant to Federal Rule of Civil Procedure 58 and the instructions of the Court, Relator respectfully requests that judgment be entered as follows:

**first**, awarding the United States **$8,260,925.58** in trebled damages jointly and severally against HCAT and each of its co-conspirators Healthcare Associates of Irving, LLP ("HCAI"), David Harbour, Kristian Daniels, Charles Powell, Walter Gaman, and Terrence Feehery pursuant to 28 U.S.C. § 3729(a)(1)(A)-(C);

**second**, awarding the United States **$449,653,800** in statutory penalties for the claims the jury found to be false, which consists of a $8,250 penalty for all 644 claims Relator alleged to have been submitted on or before November 2, 2015, plus a $20,920 penalty for each of 21,240 remaining false claims which were all submitted on or after November 3, 2015, which the jury found HCAT knowingly submitted or caused to be submitted and that each Defendant conspired to submit or cause to be submitted, jointly and severally against each of Healthcare Associates of Texas, LLC ("HCAT"), Healthcare Associates of Irving, LLP ("HCAI"), David Harbour, Kristian Daniels, Charles Powell, Walter Gaman, and Terrence Feehery pursuant to 28 U.S.C. § 3729(a)(1)(A)-(C) and 28 CFR § 85.5; and

**third**, awarding the United States post-judgment interest on the foregoing amounts from today's rate at the prevailing statutory rate, calculated as the weekly average 1-year

constant maturity (nominal) Treasury yield, as published by the Federal Reserve System each Monday for the preceding week pursuant to 28 U.S.C. § 1961.

Rule 58 directs the Court to "promptly approve the form of the judgment, which the clerk must promptly enter" where "the jury returns a special verdict or a general verdict with answers to written questions." Fed. R. Civ. P. 58(b)(2). "A party may request that judgment be set out in a separate document as required by Rule 58(a)." Fed. R. Civ. P. 58(d).

## II.    AUTHORITY FOR JUDGMENT

### A. Defendants Are Jointly and Severally Liable for False Claims Act Damages and Penalties.

Defendants who are found to have conspired under the FCA are jointly and severally liable for the illegal acts undertaken by the conspiracy. *See United States ex rel. Drummond v. BestCare Lab'y Servs., L.L.C.*, 950 F.3d 277, 285 (5th Cir. 2020) ("To hold a company's executive jointly and severally liable for submitting false claims under the False Claims Act (FCA), the government need only prove that he or she participated in a conspiracy to submit false claims"). Joint and several liability applies both to damages and statutory penalties under the FCA. *Id*; *see also United States v. Aerodex, Inc.*, 469 F.2d 1003, 1013 (5th Cir. 1972) (imposing joint and several liability). In addition, "[a] court may impose joint and several liability in setting fees." *Walker v. U.S. Dep't of Hous. & Urb. Dev.*, 99 F.3d 761, 772 (5th Cir. 1996) ("Joint and several liability may be imposed when there is a single indivisible injury and each party played a substantial role in the litigation") (cleaned up).

### B. Defendants Are Jointly and Severally Liable to the United States for Treble Damages.

The FCA provides that one who violates the statute is automatically liable to the United States for three times the amount of the damage the United States sustained because of the violation. 31 U.S.C. § 3729(a)(1); *see also United States ex rel. Dunleavy v. Cnty. of Delaware*, 279 F.3d 219, 220 (3d Cir. 2002) (holding the False Claims Act "mandates treble damages"); *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1308 (11th Cir. 2021) (treble damages "are mandated by the FCA").

Here, the jury found that the United States sustained damages in the amount of $2,753,641.86 as a result of Defendants' FCA violations. ECF 632 at 22. By operation of the FCA, Defendants are liable to the United States for three times that amount, which is **$8,260,925.58**.

**C. Defendants Are Jointly and Severally Liable to the United States for a Civil Penalty for Each False Claim They Caused or Conspired to Submit.**

The FCA additionally imposes on violators a mandatory civil penalty payable to the United States for each false claim. 31 U.S.C. § 3729(a)(1). Like treble damages, the per-claim civil penalty is mandatory. *See United States v. Bd. of Educ. of City of Union City*, 697 F. Supp. 167, 172 (D.N.J. 1988) ("The False Claims Act provides for a civil penalty… for *each* violation of the False Claims Act."); *Grant on behalf of United States v. Zorn*, 107 F.4th 782, 791 (8th Cir. 2024) (a defendant in violation of the False Claims Act "is liable for a civil penalty for each false or fraudulent claim"); *United States ex rel. Nottingham v. Thomas*, No. 4:11CV99, 2015 WL 7424738, at *7 (E.D. Va. Oct. 26, 2015) ("When calculating civil penalties under the False Claims Act, courts multiply the number of false claims by the statutory penalty imposed."); *United States v. Rogan*, No. 02 C 3310, 2006 WL 8427270, at *25 (N.D. Ill. Oct. 2, 2006), aff'd, 517 F.3d 449 (7th Cir. 2008) (stating "the imposition of civil penalties are mandatory").

Congress legislated that the FCA statutory penalty range shall be adjusted annually for inflation. *Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 122–23, n.1 (2003). The relevant time period in this case was 2015 to 2021. For false claims Defendants submitted between January 1, 2015, and November 2, 2015, the statutory penalty range is $5,500 to $11,000 per claim. *See* 28 CFR § 85.3(a)(9); *Chandler*, 538 U.S. at 123 n.1.4. For false claims submitted between November 3, 2015, and December 31, 2021—which is the vast majority of the relevant time period—the statutory penalty range is $13,946 to $27,894. *See* 28 C.F.R. § 85.5.

      1.   *The Court should apply the $5,500-$11,000 statutory penalty range to each of 644 false claims because that is the largest number of pre-November 2, 2015, claims for which there was evidence at trial.*

The jury found that during the relevant time period, HCAT and its co-conspirators submitted 21,844 false claims. The jury did not separately determine when each false claim was submitted, i.e. whether a claim was submitted before or after November 2, 2015. However, the evidence at trial was that HCAT submitted 644 allegedly false claims on or before November 2, 2015. *See* Trial Ex. 1191 (complete list of claims Relator's expert identified as false, including date). For the purposes of this motion, Relator assumes the jury counted all 644 pre-November 3, 2015, claims in its determination of the total number of false claims.[1] This is the most favorable assumption for Defendants. Pursuant to 28 C.F.R. § 85.3(a)(9) the Court should apply a civil penalty for 644 claims in a range of $5,500 to $11,000.

Multiplying the minimum and maximum per-violation penalty by the number of false claims, the mandatory civil penalty for 644 pre-November 2, 2015, false claims ranges from $3,542,000 to $7,084,000.

      2.   *The Court should apply the $13,946-$27,894 statutory penalty range to each of the 21,240 remaining post-November 3, 2015, false claims.*

Having assumed, above, that the jury's total of 21,844 false claims included all 644 false claims Relator's expert said occurred before November 2, 2015, the remaining 21,240 claims were necessarily submitted after November 3, 2015. Pursuant to 28 C.F.R. § 85.5, the range of civil penalty for each of those 21,240 claims is $13,946 to $27,894.

---

[1] The date reported in Trial Exhibit 1191 is the date when the service was performed for the patient, which always preceded the date when the claim was electronically submitted to Medicare. 28 C.F.R. §§ 85.3 and 85.5 set the civil penalty amounts based on "violations," which here means the date a claim was submitted. Relator has assumed *arguendo* that all 644 claims involving dates of service performed on or before November 2, 2015, were also electronically submitted on or before November 2, 2015, in order to give Defendants the benefit of the best available inference.

Multiplying the minimum and maximum per-violation penalty by the number of false claims, the mandatory civil penalty for post-November 3, 2015, false claims ranges from $296,213,040 to $592,468,560.

### D. Federal Courts Consider the Totality of the Circumstances When Determining The Level of Civil Penalty to Assess Within the Statutory Range.

Although the jury decides the number of violations, "the court alone sets any separate penalty" within the range—here, ranges—prescribed by Congress. *Chandler*, 538 U.S. at 132; *see also Rogan*, 2006 WL 8427270, at *25 ("Though the imposition of civil penalties are mandatory, 31 U.S.C. § 3729, the court determines the amount of the penalty."); *see also United States v. Saavedra*, 661 Fed. Appx 37, 46 (2d Cir. 2016) (finding the district court "acted within its discretion in imposing the maximum statutory penalty of $11,000 for each" violation found by the jury).

In exercising their discretion to determine the civil penalty within the statutory range, federal courts consider a variety of factors. Courts take into account "the seriousness of the misconduct, the scienter of the defendants, and the amount of damages suffered by the United States as a result of the misconduct." *U.S. ex rel. Longhi v. Lithium Power Technologies, Inc.*, 530 F.Supp.2d 888, 899 (S.D. Tex. 2008) ("the treble damages plus civil penalty framework relates directly to Congress's goal of deterring the rampant fraud in federal contracting"); *United States ex rel. Miller v. Bill Harbert Intern. Const., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007) (holding the court should "consider the nature of these penalties as deterrents to future conduct"); *see also United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015) ("Substantial penalties also serve as a powerful mechanism to dissuade such a massive course of fraudulent conduct."); *see also United States v. Shubhada Indus.*, No. CV 17-4324, 2018 WL 2735407, at *7 (E.D. Pa. June 7, 2018) (finding the maximum penalty appropriate where defendants were not "forthright or cooperative in the Government's investigation" and "falsely represented" facts).

For the reasons discussed below, Defendants' egregious conduct, willfulness, lack of contrition, and demonstrated resistance to deterrence weigh in favor of (at least) a middle-range penalty, and heavily against a penalty at the bottom of the statutory range.

       *1.   Defendants' conduct was egregious.*

The Court observed the two weeks of evidence presented to the jury concerning Defendants' multiple fraudulent Medicare billing practices; Relator does not intend to recite the entire record. There were many egregious aspects of Defendants' conduct. Defendants did not merely steal money from the Medicare fund—which is sufficiently serious conduct that Congress imposed civil penalties to deter it—Defendants also harmed patient care for Medicare beneficiaries. Below are some examples of the trial evidence of those patient harms.

- The trial evidence demonstrated Defendants submitted false claims to disguise the fact that HCAT's PEP department used unlicensed medical assistants to complete annual wellness visits for beneficiaries, even though a licensed provider must perform those services. *See, e.g.,* Trial Ex. 247, 337, 338, 343, 346, 387, 397. HCAT's use of medical assistants put patients at risk. *See, e.g.* Trial Ex. 450.0006 ("[Dr. Sarver] said the patient was fine, luckily, but that the *profanity PEP department was gonna kill someone and he doesn't want them doing his patients.").

- The trial evidence demonstrated Defendants submitted false claims to hide HCAT's use of unlicensed medical assistants to order medical procedures and tests for beneficiaries even though they were not permitted by law to make those determinations on their own and Medicare expressly prohibited licensed providers from delegating those decisions to medical assistants. *See, e.g.*, Trial Ex. 141, 277, 827, 1063, Trial Tr. Nov. 12, 72:4-5 (Heather Brown: "But they had laminated copies of the PEP protocols. They use them every day with every patient.").

- The trial evidence showed that even HCAT employees raised alarms that the PEP department's practices, which depended on submitting false claims, resulted in "meat market medicine" and treating patients "like financial assets." *See, e.g.*, Trial Ex. 815

- The trial evidence showed Defendants knew HCAT was directing medical assistants to document portions of patient charts that were reserved for

licensed providers to document, that Defendants knew it was improper, and that Defendants intentionally designed their electronic medical records system to hide the truth from potential auditors. *See, e.g.*, Trial Ex. 657, 681.

- The trial evidence showed Defendants routinely submitted claims for services performed by uncredentialed providers under the name of another provider who had not treated the patient, and that this practice was enshrined in official policy documents. *See, e.g.*, Trial Ex. 320, 464, 653, 597, 806

- The trial evidence showed Defendants established policies to bill services provided by mid-level practitioners under the names of physicians expressly to capture greater payment amounts from Medicare. *See, e.g.*, Trial Ex. 505, 329, 507, 543, 509, 657

    2. *Defendants' conduct was not just knowing, but intentional.*

The evidence at trial also showed Defendants intended to violate Medicare billing requirements. At trial, HCAT's head of clinical operations, Dr. Powell, encapsulated Defendants' intent to use the PEP department to bill Medicare for services they knew Medicare did not cover:

> [DR. POWELL]. …Patients come in with an expectation of a physical. Medicare shortchanged them with only providing the AWV. If their chronic conditions would allow us to do the rest of the stuff they would normally anticipate if they were on a Medicare Advantage plan or commercial plan, we felt like they deserved it….

Trial Tr. Nov. 8, 106:25-107:6. Dr. Powell further explained, "it would be like taking your car in for an oil change and you're expecting to get transmission work done at the same visit." Trial Tr. Nov. 8, 212:7-11. Indeed, the HCAT internal documents introduced at trial included warning after warning that HCAT's billing practices were fraudulent from external auditors like Protiviti and Universal American (*see, e.g.* Trial Ex. 435, 1002), internal professional coders like Juliette Morell (*see, e.g.* Trial Ex. 507), and coding managers like Rachel Klejeski (*see, e.g.,* Trial Ex. 684) in addition to HCAT's own vice president of revenue cycle Cheryl Taylor.

Defendants' response to these warnings further confirms their intent. HCAT compliance officer, Kristian Daniels, told Cheryl Taylor that HCAT would "take the risk" of not repaying

Medicare overpayments. (Trial Tr. Nov. 5, 60:4-9). David Harbour told Juliette Morell that HCAT

would not forego even twenty dollars of revenue despite the risk of a federal audit and fraud penalties:

> Q. Did you have any other conversations with HCAT senior leadership about
> your concerns about Medicare billings that you thought did not meet the rules?
>
> A. Yes, David Harbour.
>
> Q. Can you please describe that conversation?
>
> A. I asked him if -- you know, would you be willing to lose $20 on the front
> end, or would you want to risk, you know, maybe an audit, a federal audit on
> the back end where they would label this, you know, fraud, waste, and abuse.
>
> Q. …What was Mr. Harbour's reaction after you said that to him?
>
> A. We're going to keep it on the front end.

(Trial Tr. Nov. 11, 113:13-114:1). Because of the Court's rulings *in limine*, Ms. Morell did not describe

at trial the portion of her conversation with Mr. Harbour about the size of the civil penalty HCAT

was risking. Ms. Morell explained in her deposition that Mr. Harbour acknowledged the size of the

penalties HCAT would face <u>and yet was not deterred</u>:

> Q. So you told David Harbour, HCAT's CEO, that by—that because of their
> practice of split billing, HCAT was running the risk of being hit for penalties
> for false claims with the government?
>
> A. **$11,000 a line item.**
>
> Q. So you told HCAT's CEO that they could be hit with $11,000 per line item
> penalties for continuing their practice of split billing as false claims to the
> government?
>
> A. Yes.
>
> Q. And his response to you was we're not going to stop because the revenue
> we're getting from this practice is too important?
>
> A. He said, we're going to continue and we'll continue to get the—what I
> referenced as the $20, we'll continue to get the $20.

Morell Dep. 285:15–286:9 (objections omitted, emphasis added).

The trial evidence also showed Defendants intentionally weakened their processes for ensuring

Medicare billing compliance in order to prioritize revenue generation notwithstanding the many

warnings they were receiving. While Cheryl Taylor was attending her son's military graduation, David Harbour directed the billing team to "push out" Medicare claims that had been held because of various compliance concerns, and that "push" caused a coder to resign because of her concerns the practice was fraudulent. (Trial Tr. Nov. 5, 30:8-32:23). HCAT compliance officer Kristian Daniels directed the revenue cycle team to stop reviewing charts before submitting Medicare claims and instead to rely on "retrospective audits" to identify problems. *See, e.g.* Trial Ex. 602. But this audit-and-repay strategy was an illusion; Kristian Daniels admitted HCAT never made a single repayment to Medicare. Trial Ex. 669.

The trial evidence also showed Defendants established documented "billing under" policies for representing to Medicare that uncredentialed providers and mid-level providers were actually other physicians. *See, e.g.* Trial Ex. 201, 202. Defendants and their experts could not identify at trial a single regulation or Medicare guidance statement that supported their written policy of billing all ancillary services under the names of department directors like Dr. Powell, Dr. Feehery, and Dr. Gaman—let alone required it as Defendants' trial expert, Alice Gosfield, claimed. Defendants deliberately chose to disregard the many warnings from outside and inside billing professionals and intentionally submitted false claims. "[S]trong medicine is required to cure the defendant's disrespect for the law." *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 577 (1996) ("Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.").

### 3. The damages to the Government and the volume of Defendants' false claims are significant and warrant significant penalty.

The jury determined Defendants misappropriated more than $2.75 million from the Government by submitting 21,844 false claims. Those determinations alone make this verdict an outlier for its size.

The Court should not hesitate to impose the requested penalty merely because HCAT's fraud was so prolonged and pervasive that it resulted in the submission of tens of thousands of false claims. As the Fourth Circuit observed in cases of wide-scale fraud under the FCA:

> It was inevitable, we suppose, in the view of the vast number of government contracts—many of prodigious size and sophistication—that we would confront FCA actions involving thousands of invoices, thus exposing culpable defendants to millions of dollars of liability for civil penalties. We are entirely comfortable with that proposition. When an enormous public undertaking spawns a fraud of comparable breadth, [high penalties] help[] to ensure what we reiterate is the primary purpose of the FCA: making the government whole.

*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 407–08 (4th Cir. 2013) (*citing United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003)).

> 4. *Defendants do not accept the jury's verdict, and have not ceased their fraudulent practices.*

The threat of the FCA's civil penalties is meant to deter fraud. As discussed above, that did not work with HCAT and Defendants. They elected to submit false Medicare claims even knowing the consequences of losing at trial would include $11,000 penalties per claim or more.

Astonishingly, HCAT still refuses to acknowledge its wrongdoing. At trial, HCAT founding physician Dr. Maria Biard, who still works at HCAT (now part of WellMed) testified that they are still running the PEP Department. Trial Tr. Nov. 14 78:4-6 ("In fact, we're still running PEP, and it's still running great….") After the jury's false claims verdict became news, an HCAT lawyer doubled-down and told reporters for the Dallas Morning News that "HCAT complied with applicable Medicare billing rules[.]" *See* Gifford Decl. (Exhibit A).

Defendants' litigation decisions further reveal their lack of contrition. Litigants are of course entitled to make their defense. But throughout this action, Defendants had a continuing legal obligation to identify and repay the Government for overpayments they received, but they did not. *See* 42 U.S.C. § 1320a-7k(d)). Defendants also claimed at trial that they voluntarily used internal audits to detect any overpayments requiring repayment. These obligations and voluntary commitments existed

when Relator first filed this action and continue now. Defendants at any time could have performed the necessary analysis and repaid the Government. They chose not to. They chose not to make repayment even when their own expert, Gregory Russo, determined that he <u>could not</u> explain away more than 7,000 of the allegedly false claims. Trial Tr. Nov. 14, 34:2-13. At minimum, Russo's analysis should have triggered further review in support of potential repayment. Defendants made no attempt to comply with federal law even in the face of these clear indications of liability.

Defendants are allowed to express disregard for the jury and insist they are model healthcare providers. But the Court is likewise entitled to consider Defendants' disregard for patient care, the taxpayers, and Medicare's program integrity rules when the Court assesses the FCA penalty. *See United States v. Saavedra*, 661 Fed.Appx. 37, 46 (2d Cir. 2016) (stating the district court acted within its direction to impose the maximum statutory penalty because the defendant issued a press release showing "a disturbing refusal to accept responsibility").

     5.   *A meaningful penalty is necessary to deter HCAT and others from engaging in fraud of this magnitude against the federal treasury.*

Finally, a trivial penalty would do nothing to prevent HCAT and similarly situated healthcare providers from treating potential liability for violations of the False Claims Act as a cost of doing business. Fraud harms the United States "in ways untethered to the value of any ultimate payment." *Yates*, 21 F.4th at 131; *United States ex rel. Hueseman v. Professional Compounding Centers of America, Inc.*, SA-14-CV-00212-XR, 2024 WL 2244818, at *10 (W.D. Tex. May 1, 2024) ("'harm' under the FCA is unique, and often exceeds the direct monetary damage to the government"); *see also* S. Rep. No. 99-345, at 3 (1986) ("The cost of fraud cannot always be measured in dollars and cents"). In the healthcare context, "[f]raudulent claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system." *United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003). Conduct like HCAT's "shakes the public's faith in the government's competence and

may encourage others similarly situated to act in a like fashion." *Bunk*, 741 F.3d at 409; *see also United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988).

HCAT's strategy has been to outrun the consequences of its actions through growth. In 2016, HCAT's Medicare billing practices attracted investment from private equity group Webster Capital. (Trial Ex. 134.) HCAT and Webster could have reported the overpayments to Medicare at any time and thereby avoided FCA civil penalties. They didn't. Instead, HCAT continued to submit false claims to support its growth. In 2023, Optum Health, a subsidiary of United Health Group, acquired HCAT for a publicly reported amount of $300 million.[2] This action was well into discovery when Optum bought HCAT, so Optum knew about HCAT's fraudulent billing practices and the many warnings HCAT had received from internal and external sources. Optum could have elected to repay the Government for a fraction of the minimum FCA civil penalty. It didn't. Optum chose, as HCAT had, to "take the risk."

Now HCAT is shedding its name to operate within Optum's well-financed brand, WellMed.[3] According to WellMed's website, "WellMed is a network of doctors… for more than 1 million older adults with over 16,000 doctors' offices in Texas and Florida."[4] "In 2011, WellMed partnered with Optum, one of the nation's largest health and wellness companies…. WellMed is now part of Optum…."[5] WellMed/HCAT's owner, Optum, is itself a healthcare industry titan. According to a leading healthcare industry publication, Becker's Physician Leadership, Optum Health as of 2023 "has

---

[2] https://www.fiercehealthcare.com/payers/optums-buying-streak-continues-acquisition-healthcare-associates-texas-report (last visited Dec. 2, 2024).

[3] https://healthcareassociates.com/ (last visited Dec. 2, 2024) ("Our name is changing to WellMed. Healthcare Associates of Texas is now WellMed. Soon you will see the WellMed name both inside and outside our offices.");

[4] https://www.wellmedhealthcare.com/about-us/our-history/ (last visited Nov. 29, 2024).

[5] *Id.*

served 101 million unique consumers," "oversees more than 2,200 locations,"' and "posted a year-end revenue of $71.2 billion in 2022."[6]

Congress intended the FCA civil penalties be capable of deterring malfeasance by large and small businesses alike. The Court should be mindful of this deterrence function as it assesses the civil penalty. Relator is not asking for the maximum civil penalty, but neither is a penalty at the bottom of the range adequate to deter HCAT and similarly-situated healthcare providers who simply "roll up" into organizations large enough to treat the minimum FCA penalties as a cost of doing business. As an HCAT internal document explained, the type of fraud HCAT built into its business practice is nearly invisible to auditors without help from a whistleblower. *See* Trial Ex. 320 ("Please remember, this is an issue that is not easily addressed by a payor as all billings indicate the billing provider was the rendering provider for the claim point of view.") *See Tuomey*, 792 F.3d at 389 ("Substantial penalties also serve as a powerful mechanism to dissuade such a massive course of fraudulent conduct."). Awarding meaningful penalties "promotes deterrence of similar conduct in the future" by HCAT/WellMed/Optum. *Morsell*, 651 F.Supp.3d at 197. A defendants' ability to pay is relevant to setting the appropriate civil penalty. *See, e.g. U.S. v. Lippert*, 148 F.3d 974, 978 (8th Cir. 1998). Moreover, the Court should "consider the nature of these penalties as deterrents to future conduct from entities in similar situations to the defendants in this case." *Miller*, 501 F.Supp.2d at 57 (finding "the maximum penalty is most appropriate in order to most ably act as a deterrent of future misconduct in similar situations.").

### E. The Court Should Set Civil Penalty Amounts at the Midpoint of the Applicable Statutory Ranges.

In light of the factors set forth above, Relator asks the Court to assess a civil penalty against Defendants in the amount of $20,920 per violation after November 3, 2015, and $8,250 per violation

---

[6]https://www.beckersphysicianleadership.com/physician-workforce/optum-is-the-largest-employer-of-physicians-10-stats-to-know.html?oly_enc_id=6221H4535789I2Y

on or before November 2, 2015. These penalty levels are the middle values of the statutory penalty range and are well within the Court's discretion. Although, in Relators' view, the Court's consideration of the "totality of the circumstances" would justify the maximum statutory penalties of $27,894 and $11,000 per violation, respectively, Relator believes the requested assessment will adequately deter future conduct and account for the egregiousness of Defendants' policies and the damage done.

Relator's requested statutory penalty comports with penalties assessed in other cases and further adheres to constitutional guidelines under federal law. *See United States v. Suarez*, 966 F.3d 376, 387 (5th Cir. 2020) ("If the value of the forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional"); *see also United States v. Bajakajian*, 524 U.S. 321, 336 (1998) ("[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature."); *Yates*, 21 F.4th at 1314 (observing that "[penalties] falling below the maximum statutory fines for a given offense . . . receive a strong presumption of constitutionality") (quoting *United States v. Chaplin's Inc.*, 646 F.3d 846, 852 (11th Cir. 2011) (affirming statutory penalty of $1,177,000 with actual damages of $755.54); *Bunk*, 741 F.3d at 408 ("A cumulative monetary penalty such as that imposed under the FCA will violate the Eighth Amendment proscription against excessive fines in the *infrequent* instance that it is 'grossly disproportional to the gravity of a defendant's offense.'") (emphasis added); *United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 649 F. Supp. 3d 404 (W.D. Tex. 2023) (penalties within the statutory range enjoy strong presumption of constitutionality). The requested penalty is also in line with other civil penalties assessed in the Fifth Circuit. *See United States ex rel. Sorensen v. Outreach Diagnostic Clinic, LLP*, No. H-12-480, 2021 WL 5310987 (S.D. Tex. Nov. 15, 2021) (using statutory ranges for 2021, the court applied a $11,803 penalty per claim for 14,450 false claims to yield statutory penalty of $170,553,350 on

"singles" damages of $807,450);[7] *Montcrieff,* 649 F. Supp. 3d 404, 426 (W.D. Tex. 2023) (rejecting argument that ratio of overpayment to penalty supersedes Congressionally-imposed statutory range); *see also Cripps v. Louisiana Dep't of Agric. & Forestry,* 819 F.3d 221 (5th Cir. 2016) (approving imposition of per-violation fines that "do not exceed the limits prescribed by the statute" and amounted to about half of the maximum statutory sanction). In this action, as compared to *Sorensen*, both the number of false claims and the amount of overpayment are significantly larger.

Therefore, Relators respectfully request that the Court assess a penalty of $8,250 for each of the 644 false claims Defendants submitted on or before November 2, 2015, plus $20,920 for each of the remaining 21,240 false claims submitted on or after November 3, 2015, which the jury found Defendants either submitted or conspired to submit. The resulting total is **$449,653,800**.

### F. Defendants Are Jointly and Severally Liable for Post-Judgment Interest.

In federal court, post-judgment interest is governed by 28 U.S.C. § 1961. *See Southwestern Bell Telephone CO. v. Atlas Trading Conglomerate Inc.*, No. 3:21-cv-01271-K, 2022 WL 18588062 (N.D. Tex. Feb. 24, 2022), *citing Tricon Energy Ltd. v. Vinmar Int'l, Ltd,*, 718 F.3d 448 (5th Cir. 2013); *Hall v. White, Getgey, Meyer Co., LPA,* 465 F.3d 587 (5th Cir. 2006). Post-judgment interest is mandatory under Section 1961. *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161 (5th Cir. 2010)

Section 1961 provides that post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). Further, the interest is computed "daily to the date of

---

[7] Denying reconsideration, the *Sorenson* district court chastised the defendants: "The damages were expensive. It is the cost of violating the law." *United States ex rel. Sorenson v. Outreach Diagnostic Clinic, LLP*, No. H-12-480, 2022 WL 627228 (S.D. Tex. Jan. 3, 2022). The Fifth Circuit subsequently granted the parties' joint motion to vacate the judgment "without regards to their merits" and remanded to the trial court "in aid of settlement." *United States ex rel. Sorenson v. Outreach Diagnostic Clinic, LLP*, No. 22-20108, 2022 WL 18935544 (5th Cir. Sept. 20, 2022).

payment" and "compounded annually." Id., at § 1961(b). Relators respectfully request that the Court award post-judgment interest pursuant to Section 1961 from the date of entry of final judgment in this case.[8]

### III.    PRAYER FOR JUDGMENT

Accordingly, for the reasons set forth above and pursuant to Rule 58 and the instructions of the Court, Relator respectfully requests judgment be entered as follows:

**first**, awarding the United States **$8,260,925.58** in trebled damages jointly and severally against HCAT and each of its co-conspirators HCAI, David Harbour, Kristian Daniels, Charles Powell, Walter Gaman, and Terrence Feehery;

**second**, awarding the United States **$449,653,800** in statutory penalties for the claims the jury found to be false, jointly and severally against each of HCAT, HCAI, David Harbour, Kristian Daniels, Charles Powell, Walter Gaman, and Terrence Feehery; and

**third**, awarding the United States post-judgment interest on the foregoing amounts from today's rate at the prevailing statutory rate, calculated as the weekly average 1-year constant maturity (nominal) Treasury yield, as published by the Federal Reserve System each Monday for the preceding week pursuant to 28 U.S.C. § 1961.

---

[8] Relator will separately seek reimbursement of her expenses, attorneys' fees, and costs expended in prosecuting this case after entry of judgment under Rule 54 of the Federal Rules of Civil Procedure. The FCA provides that a person who violates the statute "shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages." 31 U.S.C. § 3729(a)(3). When a private person brings an FCA case to the Government that the Government declines to pursue, that person is similarly entitled to receive "an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs" awarded against the defendant." *Id.*, at § 3730(d)(2).

Dated: December 2, 2024.

JOHNSTON CLEM GIFFORD PLLC

By: /s/ Robert W. Gifford
   **Robert W. Gifford**
   State Bar No. 24093543
   rgifford@johnstonclem.com

   **Daniel S. Klein**
   State Bar No. 24052277
   dklein@johnstonclem.com

   1717 Main Street, Suite 3000
   Dallas, Texas 75201
   (214) 974-8000 (Telephone)
   (972) 474-1721 (R. Gifford Direct)
   (972) 474-1750 (Facsimile)

   *Attorneys for Relator,*
   *Cheryl Taylor*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 2, 2024, a true and correct copy of the foregoing document was filed with the Clerk of Court via the CM/ECF system, causing it to be served electronically on all counsel of record receiving electronic service.

By: /s/ Robert W. Gifford
   **Robert W. Gifford**